# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**MATTHEW D. ANGLEMEYER**
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ANDREW R. FALK**
Deputy Attorney General
Indianapolis, Indiana



FILED

Feb 07 2013, 9:30 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| TERRY SMITH, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A05-1202-CR-88 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Kurt Eisgruber, Judge
Cause No. 49G01-1003-FA-17803

**February 7, 2013**

**OPINION – FOR PUBLICATION**

**MATHIAS, Judge**

Terry Smith ("Smith") was convicted in Marion Superior Court of Class B felony robbery, Class B felony possession of a firearm by a serious violent felon, Class D felony auto theft, and Class D felony resisting law enforcement. Smith appeals and presents five issues, which we reorder and restate as:

I. Whether the trial court abused its discretion in granting the State's motion to continue the trial in order to obtain certain evidence;

II. Whether the trial court abused its discretion in admitting evidence and testimony regarding shell casings collected in the area where Smith had fled from the police;

III. Whether the trial court abused its discretion in admitting into evidence items seized from Smith's home pursuant to a search warrant;

IV. Whether the trial court abused its discretion in admitting DNA evidence obtained from a buccal swab taken from Smith; and

V. Whether the State presented evidence sufficient to support a finding that Smith was an habitual offender.

We affirm.

**Facts and Procedural History**

Shortly after midnight on the morning of February 12, 2009, Jessie Dulaney ("Dulaney") looked where he had parked his vehicle, a red Chevrolet Lumina minivan, and saw a man, later identified as Smith, driving away in the van. Dulaney, who lived near 30th Street and Post Road in Indianapolis, had not given Smith, or anyone else for that matter, permission to use his van, and telephoned the police to report that his van had been stolen.

Later that morning, at approximately 8:50 a.m., Ken Rozelle ("Rozelle") went to the Chase Bank branch located on 42nd Street and Franklin Road in Indianapolis. The

bank opened at 9:00 a.m., and Rozelle wanted to be one of the first customers so he could conduct his business quickly. Rozelle noticed a red Chevrolet Lumina minivan parked in the bank's parking lot. The van was parked close to the bank's door, and a light-skinned African-American man with a beard was sitting in the driver's seat talking on his mobile phone. Rozelle went into the bank when it opened, deposited a check, and went back to his car within a few minutes. When he went back to his car, he noticed that the man in the van, later identified as Smith, was still in his car and had not yet gone into the bank. This struck Rozelle as odd, because most customers enter the bank quickly once the bank opens. When Rozelle drove away, Smith was still in the van.

Shortly thereafter, Smith went into the bank and fired one shot from a black semi-automatic handgun. Smith was wearing a black knit cap, gray sweatpants, a sweatshirt, and had a white bandana covering most of his face. Still, the bank employees could observe that the gunman appeared to be a light-skinned African-American man who was approximately 5' 7" tall. Smith yelled at the bank employees to get on the floor. Bank employee Jennifer Aasen ("Aasen") realized that a robbery was in progress and pressed a button that sounded a silent alarm to the police. The bank tellers were situated behind bulletproof glass, and the only way to approach them was through a door next to the desk of customer-service representative Julie Carson ("Carson"). Smith, seeming to know this, headed straight for Carson, pointed his gun at her, and instructed her to unlock the door to the teller area and hold the door open for him. Carson complied. Pointing his handgun, Smith then went to each of the three tellers and demanded that they put money in a black

pillowcase Smith had. He demanded money from both of the drawers each teller had access to and instructed them not to put any dye packs in with the money.

After collecting $27,659 in cash, Smith ran out of the bank. After Smith left, branch manager Tonya Bruce ("Bruce") locked the front door to the bank. She then directed all the employees to fill out questionnaires regarding the robbery and their descriptions of the robber. Lt. Jack Bailey ("Lt. Bailey") of the Lawrence Police Department heard a dispatch of a suspected robbery at the Chase Bank at 42nd Street and Franklin Road. Lt. Bailey was only a short distance from the bank and could actually see the bank from where he was when he heard the dispatch. He drove straight to the bank and pulled in the parking lot. As he did, he saw Smith run from the bank, throw something into his van, and drive away. Lt. Bailey pursued Smith. When he checked the license plate on the van, Lt. Bailey was informed that the van had been stolen the night before. This heightened Lt. Bailey's suspicions that Smith had just robbed the bank.

Even though Lt. Bailey had activated his emergency lights and siren, Smith refused to pull over. Lt. Bailey continued to pursue Smith until Smith pulled the van into a residential neighborhood and to the yard of a home on Dubarry Road. Behind this home was a fence that separated the home's yard from Pinnacle Square Apartments. The fence behind the home had been broken down. In Lt. Bailey's experience, people at the apartment complex used the hole in the fence to enter the apartment complex, and those fleeing from the police would use the hole in the fence to escape from the police. Smith left the van and ran toward the corner of the home on Dubarry Road. As Lt. Bailey parked his car and got out to follow Smith, Smith fired a shot from his handgun that

4

struck the front passenger-side door of Lt. Bailey's patrol car. Lt. Bailey fired two shots in return and sought cover behind a large tree. Smith fired two more shots at Lt. Bailey, who could see Smith run back behind the house. Lt. Bailey waited for backup officers to arrive. Approximately fifty other police vehicles responded and set up perimeters around the apartment complex where they believed Smith had fled. However, the police were unable to locate Smith that day.

Detective Michelle Stewart ("Detective Stewart") went to the Chase Bank and spoke with the employees regarding the robbery and viewed the video captured by the bank's security cameras. Based on what she learned from the employees and the video, she gave a description of the robber to the other police officers, describing the perpetrator as a "younger black male of medium build, medium height, not too tall, not super short," and further described him as a "lighter-skinned black male" or Hispanic male wearing a gray jogging suit. Tr. pp. 627, 655. Crime Scene Specialist Donald Toth ("Toth") collected ten bullet fragments from the Chase Bank, and collected two .40 caliber Winchester shell casings at the home on Dubarry Road. He also found a bullet in the door of Lt. Bailey's car and a .45 caliber shell casing in the van Smith had been driving. Toth also found two .45 caliber shell casings in the back yard area of the home. Later testing determined that all three .45 caliber shells had been fired by the same gun, a High Point brand weapon. Inside the van, the police found the black pillowcase Smith had used in the robbery along with all of the money stolen from the bank.

A few days later, the police received information from a confidential informant that indicated that Smith was involved in the robbery. The informant gave the police

information indicating that he did in fact know Smith and also knew information about Smith that had not been released to the public. Using this information, the police obtained a warrant to search Smith's apartment at the Pinnacle Square Apartment complex. Inside, the police found a black knit hat and a pair of gray sweatpants. Although Smith matched the description of the robber, the police did not arrest him at the time of the search. Subsequent testing found DNA on the pillowcase found inside the van and used in the robbery. The police then got a warrant to obtain Smith's DNA from a buccal swab of his cheek. Smith's DNA was a "major contributor" to two of the DNA samples found on the pillowcase. The police then interrogated Smith, who waived his Miranda rights. Smith denied that he was the robber and denied ever having been to the Chase branch that had been robbed. But he later admitted that he had been to that branch before.

On March 8, 2010, the State charged Smith with Class A felony attempted murder, Class B felony armed robbery, Class B felony criminal confinement, Class B felony unlawful possession of a firearm by a serious violent felon, Class D felony auto theft, and Class D felony resisting law enforcement. The State subsequently amended the charges to add an allegation that Smith was an habitual offender. A jury trial was held on May 31 through June 3, 2011. At the conclusion of this trial, the jury found Smith not guilty of attempted murder and criminal confinement, but was unable to reach a verdict on the remaining counts. The trial court declared a mistrial as to the counts on which the jury was unable to reach verdict, and a second jury trial on those counts was set for August 22, 2011.

Smith then moved for a speedy trial on July 22, 2011, and the trial court set October 1, 2011, as the "deadline" for the trial. On August 2, 2011, the State moved to continue the trial. Smith indicated that he had no objection so long as the trial was still held within the speedy trial deadline. The trial court granted the State's motion to continue and moved the trial to September 19, 2011. At a pre-trial conference held on September 15, 2011, the State orally moved to continue the trial again. Over Smith's objection, the trial court reset the trial for December 19, 2011. Smith filed a motion for discharge and dismissal on October 28, 2011, alleging that the speedy trial deadline had passed. The trial court subsequently denied this motion. The trial court also denied Smith's pre-trial motions to suppress evidence obtained as a result of the search warrant and the buccal swab.

Smith's second jury trial began on December 19, 2011. On December 21, 2011, the jury found Smith guilty of Class B felony robbery, Class D felony auto theft, and Class D felony resisting law enforcement. Smith waived his right to a jury trial on the charge of possession of a firearm by a serious violent felon and the allegation that he was an habitual offender. The trial court later found Smith guilty of possession of a firearm by a serious violent felon and found Smith to be an habitual offender.

At a hearing held on January 27, 2012, the trial court sentenced Smith to fifteen years on the robbery conviction, to which a thirty-year habitual offender enhancement was added. The trial court sentenced Smith to twenty years for possession of a firearm by a serious violent felon, three years for auto theft, and three years for resisting law

enforcement. All of these sentences were to run concurrently with the forty-five-year enhanced sentence imposed on the robbery conviction. Smith now appeals.

## I. State's Motion to Continue

Smith argues that the trial court erred in granting the State's motion to continue made before the scheduled September 19, 2011 trial date. As noted above, after Smith's first trial, Smith moved for a speedy trial pursuant to Criminal Rule 4(B). This rule provides in relevant part that:

> If any defendant held in jail on an indictment or an affidavit shall move for an early trial, he shall be discharged if not brought to trial within seventy (70) calendar days from the date of such motion, except where a continuance within said period is had on his motion, or the delay is otherwise caused by his act, or where there was not sufficient time to try him during such seventy (70) calendar days because of the congestion of the court calendar.

Crim. R. 4(B).

As explained in Chambers v. State, 848 N.E.2d 298, 303-04 (Ind. Ct. App. 2006), Criminal Rule 4(D) provides that a trial court may grant the State a continuance when it is satisfied that: (1) there is evidence for the State that cannot then be had, (2) reasonable effort has been made by the State to procure the evidence, and (3) there is just ground to believe that such evidence can be had within ninety days. Any exigent circumstances may warrant a reasonable delay beyond the limitations of Criminal Rule 4. Id. at 304. The reasonableness of such delay should be judged in the context of the particular case, and the decision of the trial judge will not be disturbed except for an abuse of discretion. Id. "'Rule 4(D) does not mandate the evidence be essential or unique, only that it be unavailable and that the State be entitled to present it.'" Wilhelmus v. State, 824 N.E.2d

8

405, 413 (Ind. Ct. App. 2005) (quoting Smith v. State, 502 N.E.2d 485, 488 (Ind. 1987)). The purpose of Criminal Rule 4(B) is to assure criminal defendants speedy trials, not to provide them with a technical means of avoiding trial. Id. at 412.

During Smith's first trial, the State called witness Shelly Crispin ("Crispin"), a forensic scientist, to testify regarding the DNA analysis she performed upon the samples taken from the pillowcase. The State, however, did not call as a witness Judith Macechko ("Macechko"), the serologist who had taken the samples from the pillowcase. Smith objected to the introduction of the DNA evidence at his first trial, but not on the grounds that there was a lack of foundation. In preparation for the second trial, the State requested a transcript of the first trial. The State did not receive the transcript until September 14, 2011—just five days before the scheduled start of the second trial. In reviewing this transcript, the State discovered that, for reasons unknown, Macechko had not been called to testify at the first trial. The State further discovered that Macechko had moved to Ohio to take care of her ailing mother and was unable to return to Indiana to testify; nor was the State able to depose Macechko in time for the upcoming trial. Therefore, on September 15, 2011, the State moved to continue the trial in order to obtain Macechko's deposition. The trial court agreed and granted the State's motion.

On appeal, Smith claims that the State did not make a reasonable effort to obtain the evidence, and that the evidence could have been obtained before the expiration of the speedy trial deadline. The trial court obviously disagreed, and we are unable to say that the trial court's decision amounted to an abuse of discretion. The State did not obtain the transcript of the first trial until shortly before the scheduled start of the second trial.

9

When the State discovered that there was a potential issue with the introduction of the DNA evidence without Macechko's foundational testimony, it attempted to contact her to obtain her testimony. When the State learned that Macechko was unable to return to the State due to the health of her mother, it then sought to continue the trial in order to depose her.[1] Under these facts and circumstances, we cannot say that the trial court abused its discretion in determining that the State made a reasonable effort to obtain the evidence and that the State could not have obtained Macechko's testimony prior to the expiration of the speedy trial deadline.

We agree with the State that Smith's citation to Chambers is misplaced. In that case, the evidence at issue was a lab report that the prosecution did not have in its possession, but which had actually been completed six days before the State moved to continue the trial. See 848 N.E.2d at 299-300. On appeal, a panel of this court held that the prosecutor could have discovered that the report was ready by simply telephoning the laboratory and asking. Id. at 304. Here, however, the State did not have Macechko's testimony available, nor was it readily available at the time the State moved to continue. In short, the trial court did not abuse its discretion in granting the State's motion to continue under Criminal Rule 4(D).

## II. Admission of Evidence Regarding Shots Fired and Casings Found

Smith next claims that the trial court abused its discretion when it allowed testimony regarding the shots that were fired at Lt. Bailey and the shell casings found

---

[1] The State also asked Smith to stipulate as to the foundation of the DNA evidence, but Smith refused, which he was entirely within his rights to do.

during the investigation of the robbery. Because Smith was acquitted of the charge of attempted murder at the first trial, he claims that the admission of this evidence was irrelevant to the charges presented to the jury[2] and, even if relevant, such relevance was outweighed by the danger of unfair prejudice. See Ind. Evidence Rules 402, 403.

In reviewing this claim, we note that the admission of evidence is within the sound discretion of the trial court, and we review the court's decision only for an abuse of that discretion. Boatner v. State, 934 N.E.2d 184, 186 (Ind. Ct. App. 2010). The trial court abuses its discretion only if its decision is clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law. Id.

Indiana Evidence Rule 402 provides generally that relevant evidence is admissible and irrelevant evidence is inadmissible. "Relevant evidence" is defined as "evidence having *any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ind. Evidence Rule 401 (emphasis added). In order to be relevant, the evidence at issue "need only have some tendency, however slight, to make the existence of a material fact more or less probable, or tend to shed any light upon the guilt or innocence of the accused." Simmons v. State, 717 N.E.2d 635, 638 (Ind. Ct. App. 1999).

In this case, we are unable to say that the trial court abused its discretion in determining that the evidence of the shooting met this rather low threshold for relevancy.

---

[2] In the initial guilt phase of the jury trial, the question of whether Smith was guilty of being a serious violent felon in possession of a firearm was not yet before the jury, as the trial court planned to present this issue to the jury after the initial guilt phase. This subsequent phase of the jury trial never occurred because Smith waived his rights to a jury trial on this issue and the issue of whether he was an habitual offender.

11

We agree with the State that although the question of attempted murder was not before the jury, the evidence regarding the shooting was relevant to show where Smith went after he went around the home and why Lt. Bailey did not immediately follow and apprehend Smith.

And we cannot ignore the fact that Smith was still charged with resisting law enforcement for knowingly fleeing from Lt. Bailey. The State charged Smith with resisting law enforcement as follows:

> Terry W. Smith, on or about February 12, 2009, did knowingly flee from Lt. Jack Bailey, a law enforcement officer empowered by the Lawrence Police Department, after Lt. Jack Bailey had identified himself by visible or audible means and ordered Terry W. Smith to stop, and while committing said offense Terry W. Smith did operate a vehicle, that is: a 1990 Chevrolet Lumina mini-van.

Appellant's App. p. 58. Thus, while Smith's act of fleeing in the minivan was relevant and necessary to convict him as charged, evidence regarding where Smith went as he continued to flee from Lt. Bailey after he got out of the car was not irrelevant to the issue of how and where Smith fled.

Nor do we think that the trial court abused its discretion in concluding that the relevance of this information was not outweighed by the danger of unfair prejudice. "All evidence that is relevant to a criminal prosecution is inherently prejudicial, and thus the Evidence Rule 403 inquiry boils down to a balance of the probative value of the proffered evidence against the likely *unfair* prejudicial impact of that evidence." Duvall v. State, 978 N.E.2d 417, 428 (Ind. Ct. App. 2012) (citing Carter v. State, 766 N.E.2d 377, 382 (Ind. 2002)).

12

Here, the evidence regarding the shooting and the location of the casings was highly relevant, and we cannot say that this evidence was unfairly prejudicial. Indeed, the jury also heard evidence that Smith pointed a weapon during the bank robbery and fired a shot when he first went inside the bank. Thus the jury was already well aware that Smith was armed and had fired a weapon. Under these facts and circumstances, we cannot say that the evidence that Smith fired his weapon as he fled from the police was unfairly prejudicial.[3]

### III. Validity of Search Warrant

Smith also challenges the validity of the search warrant obtained by the police in order to search Smith's apartment. The police investigating the robbery were called to the jail because an inmate indicated that he knew information about the robbery. The detectives spoke to the inmate and included the following information in the subsequently-prepared probable cause affidavit:

> On 2-17-2009 Det. Michele Stewart and Det. Sgt. Mark Osborn with the Lawrence Police Department received a call from the Marion County Jail. The Jail advised they had a subject in the jail that requested to speak with the assigned Detectives on the bank robbery and that he may have information on it

---

[3] Moreover, even if we were to agree with Smith that the relevance of this evidence was outweighed by the danger of unfair prejudice, any error in the admission of this evidence would have been harmless. See Jackson v. State, 973 N.E.2d 1123, 1129 (Ind. Ct. App. 2012) (if a conviction is supported by substantial independent evidence of guilt so that there is no substantial likelihood the challenged evidence contributed to the conviction, the error is harmless). Here, there was substantial independent evidence of guilt supporting Smith's convictions such that we are satisfied that any error in the admission of evidence regarding the shooting was harmless. Specifically, Smith was the same height and build as the description of the robber given by the victims; Smith had a beard and a lighter complexion, again matching the description of the robber given by the police; clothes matching those worn by the robber were found in Smith's apartment shortly after the robbery; Smith lived in the apartment complex where the robbery suspect had fled toward; and Smith's DNA was found on the pillowcase that was found in the van used by the robber to flee the scene of the robbery.

13

The subject at the jail . . . wished to remain anonymous for fear of his safety to himself and his children. The CI advised that the person we were looking for was a black male he knew as Terry. He states that Terry goes by the nickname of BB. The CI also advised that he is familiar with Terry. The reason he believes Terry is the suspect is because he has seen Terry wearing a gray sweat suit identical to what he saw on the news. He further stated that Terry wears a pair of dark tennis shoes and carries a .45 Caliber High Point. CI states Terry has also done time for bank robbery and has bragged about shooting at the police and getting away from them during past crimes he has committed. CI advises that Terry lives in Pinnacle Square Apartments. CI states that Terry likes to steal mini vans and often times cracks the column on the left side of the steering column.

CI describes Terry as a light skinned black male. CI states Terry is short with a muscular build about 5'8 [sic] and 170 pounds. BMV and jail records show Terry Smith as 5'8 [sic] and 175 pounds.

The information the CI provides on the caliber of weapon and the column being cracked on the left side was not information that was released to the news media. The CI also advised that Terry drove a blue Chevrolet Caprice with chrome on the vehicle and also owned a maroon colored mini van.

Det. Sgt. Mark Osborn knew from previous incidents back in September of 2008 that BB was a Terry Smith. Det. Osborn asked the CI if Terry lived in Pinnacle with his brother Jessie and the CI state[d], "yes, that is him." The suspect was identified as Terry Smith B/M with a DOB of 8-17-1982.

On 2-18-2009 Det. Michele Stewart located a traffic stop involving Terry Smith driving a blue Chevy Caprice with [an Indiana license] and the last four of the VIN as 0077 on 1-23-2009. The vehicle is registered to Terry Smith's Mother . . . .

* * *

On 2-20-2009 the manager of Pinnacle Square Apartments advised that [a certain apartment] was rented by [Smith's mother]. Maintenance further advised that they fixed a window on February 14th and were let into the apartment by a B/M. Maintenance was shown a photo of Terry Smith and advised that is who let them in the apartment.

A background check of Terry Smith showed that on November of 2002 that Terry Smith was arrested for armed Robbery. In this robbery Terry Smith used a pillowcase to put money in and used a white t-shirt or white cloth to cover his face.

In July 2003 Terry Smith was arrested for a bank robbery. During this bank robbery Terry Smith confronted the tellers and demanded the large bills. The teller was not moving fast enough so [Smith] went to the lower

14

drawer himself and started grabbing money. Terry Smith removed the dye
pack from the drawer and threw it at the teller.

Exhibits Vol., Defendant's Ex. A, pp. 489-90. Smith now claims that the probable cause affidavit was insufficient because it was based on hearsay information provided by an anonymous source.

Both the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution require probable cause for the issuance of a search warrant. Casady v. State, 934 N.E.2d 1181, 1188 (Ind. Ct. App. 2010), trans. denied (citing Mehring v. State, 884 N.E.2d 371, 376 (Ind. Ct. App. 2008), trans. denied). Probable cause is a fluid concept incapable of precise definition and must be decided based on the facts of each case. Id. In deciding whether to issue a search warrant, the issuing magistrate's task is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit, there is a fair probability that evidence of a crime will be found in a particular place. Id. at 1188-89. The duty of a reviewing court is to determine whether the issuing magistrate had a substantial basis for concluding that probable cause existed. Id. at 1189. While we review the question *de novo*, we give significant deference to the issuing magistrate's determination and focus on whether reasonable inferences drawn from the totality of the evidence support the finding of probable cause. Id. "In determining whether an affidavit provided probable cause for the issuance of a search warrant, doubtful cases are to be resolved in favor of upholding the warrant." Mehring, 884 N.E.2d at 377. "'On review, we consider only the evidence presented to the issuing magistrate and not *post hac* justifications for the

15

search.'" Casady, 934 N.E.2d at 1189 (quoting Jaggers v. State, 687 N.E.2d 180, 182 (Ind. 1997)).

Where a warrant is sought based on hearsay information, the affidavit must either: (1) contain reliable information establishing the credibility of the source and of each of the declarants of the hearsay and establishing that there is a factual basis for the information furnished; or (2) contain information that establishes that the totality of the circumstances corroborates the hearsay. State v. Spillers, 847 N.E.2d 949, 953-54 (Ind. 2006) (citing Ind. Code § 35-33-5-2(b)(1) and (2)). The trustworthiness of hearsay for the purpose of proving probable cause can be established in several ways, including where: (1) the informant has given correct information in the past, (2) independent police investigation corroborates the informant's statements, (3) some basis for the informant's knowledge is demonstrated, or (4) the informant predicts conduct or activity by the suspect that is not ordinarily easily predicted. Id. (citing Jaggers, 687 N.E.2d at 182). However, these examples are not exclusive, and "[d]epending on the facts, other considerations may come into play in establishing the reliability of the informant or the hearsay." Id.

> With regard to anonymous sources, our supreme court has stated:

> Use of anonymous informants to establish probable cause often presents heightened reliability concerns. Because there is no possibility of criminal liability for filing a false police report, the informant has no incentive to be truthful. Anonymity effectively shields from scrutiny any possible ulterior motives; the situation is rife with the potential for pranks and mischief. Accordingly, some corroboration of the accusations is all the more essential when the informant is anonymous. At the same time, anonymous tips can provide important information enabling police to apprehend suspects who otherwise might escape detection. A balance must be struck between these

16

considerations. As <u>Gates</u> put it: "While a conscientious assessment of the basis for crediting [anonymous] tips is required by the Fourth Amendment, a standard that leaves virtually no place for anonymous citizen informants is not."

<u>Jaggers</u>, 687 N.E.2d at 182-83 (quoting <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983)) (other citations omitted).

Here, however, it is not entirely clear that the confidential informant was truly "anonymous." Simply because the police did not list the informant's name in the probable cause affidavit does not mean that the informant's identity was unknown to the police. To the contrary, the fact that the informant was an inmate at the jail indicates that the police did know who the informant was and that the informant simply did not want the police to name him as the source of the information implicating Smith. Thus, the confidential informant here is not the prototypical "anonymous tipster" who has no incentive to be truthful because there is no possibility of criminal liability for making a false report. <u>See</u> <u>Jaggers</u>, 687 N.E.2d at 182. On the other hand, the confidential informant used here is also not the innocent "concerned citizen" who was a witness to or victim of a crime. <u>See</u> <u>Frasier v. State</u>, 794 N.E.2d 449, 457 (Ind. Ct. App. 2003).

Moreover, the confidential informant revealed information indicating that he personally knew Smith, and knew details about Smith that had not been publicized and were not readily known by a general member of the public, including his preferred weapon and his modus operandi for stealing vehicles. This information showed that there was some independent and unique basis for the informant's knowledge. In fact, because certain details of the robbery had not been made public, the fact that the informant knew

17

these details about Smith, who already matched the description of the robber, adequately established the reliability of the information provided by the informant.

Furthermore, even if we were to conclude that the warrant was unsupported by probable cause, this would not necessarily require exclusion of the evidence seized as a result of the search. Although the exclusionary rule generally provides that evidence seized in a search conducted pursuant to an invalid search warrant may not be admitted at trial, the "good faith exception" allows the admission of evidence seized during the execution of a search warrant if the State can show that the officer conducting the search relied in good faith upon a properly issued, but subsequently invalidated warrant. Johnson v. State, 952 N.E.2d 305, 310 (Ind. Ct. App. 2011), trans. denied.[4] "The good faith exception to the warrant requirement 'was created in large part because of the practical reality that once a neutral and detached magistrate has issued a search warrant, there is literally nothing more the policeman can do in seeking to comply with the law. . . .'" Johnson, 952 N.E.2d at 310 (quoting Rice v. State, 916 N.E.2d 296, 304 (Ind. Ct. App. 2009), trans. denied). Although police officers are required to have a reasonable knowledge of what the law prohibits, imposing on them the obligation to second-guess a

---

[4] In Indiana, the good faith exception is codified in Indiana Code section 35-37-4-5, which provides in relevant part that:

   (a) In a prosecution for a crime or a proceeding to enforce an ordinance or a statute defining an infraction, the court may not grant a motion to exclude evidence on the grounds that the search or seizure by which the evidence was obtained was unlawful if the evidence was obtained by a law enforcement officer in good faith.
   (b) For purposes of this section, evidence is obtained by a law enforcement officer in good faith if:
   (1) it is obtained pursuant to:
       (A) a search warrant that was properly issued upon a determination of probable cause by a neutral and detached magistrate, that is free from obvious defects other than nondeliberate errors made in its preparation, and that was reasonably believed by the law enforcement officer to be valid[.]

18

magistrate's decision in all but the most obvious instances of an affidavit lacking an indicia of probable cause is not a burden the law anticipates. Id. (citing Jackson v. State, 908 N.E.2d 1140, 1144 (Ind. 2009). Suppression is appropriate only where, upon facts known to the issuing magistrate or judge, a well-trained officer would have known that the search was illegal despite the magistrate's authorization. Id.

There are in turn exceptions to the good faith exception, and the good faith exception does not apply where: (1) the warrant is based on false information knowingly or recklessly supplied; (2) the warrant is facially deficient; (3) the issuing magistrate is not detached and neutral; or (4) the affidavit or sworn testimony upon which the probable cause rests is so lacking in indicia of probable cause as to render an official belief in the existence of the warrant unreasonable. Id. at 310-11.

Smith makes no argument that the police supplied the issuing magistrate with false information, that the warrant was facially deficient, or that the magistrate was not detached or neutral. Instead, he claims that the affidavit for probable cause was so lacking in indicia of probable cause as to render the an official belief in the existence of the warrant unreasonable. We disagree. In fact, we have already determined that the affidavit was adequate to support a finding of probable cause. Smith's suggestion that the affidavit at issue was one of the "most obvious instances of an affidavit lacking an indicia of probable cause" is completely without merit. Johnson, 952 N.E.2d at 310.

Perhaps the police could have corroborated more of the confidential informant's information and inquired as to whether the informant knew more non-public information about Smith and his involvement with the robbery. But based on what the confidential

19

informant did tell them, we conclude that the police acted in objective good faith in relying on the search warrant. See Lloyd v. State, 677 N.E.2d 71, 76 (Ind. Ct. App. 1997) (concluding that good faith exception did apply where officer had firsthand knowledge that third party had attempted to obtain marijuana from defendant's apartment, undercover officer later purchased marijuana from this third party, and the third party stated that her "source" still had marijuana, thus a reasonable person could conclude that defendant was the "source" referred to); Newby v. State, 701 N.E.2d 593, 604 (Ind. Ct. App. 1998) (holding that good faith exception did not apply to search of defendant's residence where affidavit characterizing informant as credible and reliable contained false information, affidavit did not fully disclose context in which informant gave his statements to police, and no serious effort was made to corroborate that informant's allegations were reliable).

Accordingly, exclusion of the evidence seized during the execution of the warrant was not required, and the trial court did not abuse its discretion by admitting the evidence found during the execution of the search warrant.

### IV. DNA Evidence

Smith also claims that the trial court erred in admitting DNA evidence obtained as a result of a buccal swab of Smith. We again note that the admission of evidence is within the discretion of the trial court. Boatner, 934 N.E.2d at 186. Smith claims that the DNA obtained from the buccal swab should have been excluded because the swab was not performed in strict compliance with the procedures set forth in Indiana Code section 10-13-6-12. This section provides that:

DNA samples for the Indiana DNA data base must be collected in a medically approved manner by one (1) of the following:
(1) A physician.
(2) A registered nurse.
(3) A licensed vocational nurse.
(4) A licensed clinical laboratory technologist.
(5) Any other person trained to collect DNA samples properly.

Smith notes that the police directed Smith himself to swab his own cheek. As Smith is not a physician, a nurse, a laboratory technologist, or a person trained to collect DNA samples properly, he argues that the DNA collected during the buccal swab was not obtained properly and should have therefore been excluded.

The weakness of Smith's argument is readily apparent from reading the first line of this statute. Section 10-13-6-12 sets forth who is allowed to collect DNA samples "for the Indiana DNA data base."[5] The DNA sample taken from Smith was not for the DNA database, but to compare with DNA collected from the pillowcase found in the van abandoned by the robber. Because this statute is not applicable to the buccal swab used to obtain a DNA sample from Smith, Smith's argument fails.

### V. Habitual Offender Enhancement

Smith lastly claims that the State failed to prove the prior felonies supporting his habitual offender adjudication. To prove that Smith had a prior unrelated felony conviction for robbery in 2003,[6] the State submitted two arrest reports and an abstract of judgment. Smith notes that the abstract of judgment for the 2003 conviction was signed by Master Commissioner Nancy Broyles. Smith, citing Long v. State, 962 N.E.2d 671

---

[5] In fact, all of Indiana Code article 10-13-6 pertains to the Indiana DNA database.

[6] Smith does not challenge the sufficiency of the evidence regarding his 2001 conviction for attempted robbery. See Appellant's Br. p. 37 n.18.

21

(Ind. Ct. App. 2012), trans. denied, claims that a master commissioner does not have the authority to enter a final judgment on a sentence following a guilty plea.

In Long, the trial court judge rejected the sentence imposed by the master commissioner. On appeal, the defendant argued that the trial court had no authority to reject the sentence imposed by the master commissioner because the commissioner had the statutory authority to impose a sentence on her own, without requiring approval of the trial court judge. In addressing this argument, the Long court noted first that "a Marion County master commissioner 'has the powers and duties prescribed for a magistrate under IC 33-23-5-5 through IC 33-23-5-9.'" 962 N.E.2d at 673 (quoting Ind. Code § 33-33-49-16(e)). Magistrates, and thus master commissioners, are generally precluded from entering final orders. Id. (citing Ind. Code § 33-23-5-8(2)). As noted in Long, the main exception to this rule is found in Indiana Code section 33-23-5-9(b), which provides that "[i]f a magistrate presides at a criminal trial, the magistrate may do the following: (1) Enter a final order. (2) Conduct a sentencing hearing. (3) Impose a sentence on a person convicted of a criminal offense." See also Ind. Code § 33-23-5-5(14) ("A magistrate may . . . [e]nter a final order, conduct a sentencing hearing, and impose a sentence on a person convicted of a criminal offense as described in section 9 of this chapter."). The court in Long concluded that because the defendant in that case had pleaded guilty, the magistrate did not "preside at a criminal trial" as set forth in Indiana Code section 33-23-5-9(b) and that the magistrate therefore did not have the authority to sentence Long. 962 N.E.2d at 673-74.

In so holding, Long distinguished and disagreed with another holding of this court in Ivy v. State, 947 N.E.2d 496 (Ind. Ct. App. 2011). In Ivy, the defendant pleaded guilty and was sentenced by a master commissioner. On appeal, Ivy first argued that the master commissioner was without authority to rule on the defendant's motion to be placed in community corrections. We first noted that master commissioners have the same authority as magistrates. Id. at 498. We then concluded that "[b]ecause magistrates, and therefore master commissioners, are authorized to enter final orders in criminal trials, conduct sentencing hearings, and impose sentences on convicted persons, we conclude that [the master commissioner] had the power to enter a final judgment on Ivy's motion to modify his sentence." Id. at 498-99.

We need not, however, resolve any conflict between Ivy and Long because there is no indication that Smith ever challenged the validity of his guilty plea and subsequent conviction for robbery on the basis that the master commissioner was without authority to enter a final order. "[A] defendant may not wage a collateral attack on the validity of a prior conviction during a habitual-offender proceeding unless the court documents on their face raise a presumption that the conviction is constitutionally infirm and the apparent constitutional infirmity undermines the integrity and reliability of the guilt determination." Dexter v. State, 959 N.E.2d 235, 238 (Ind. 2012) (citing Gross v. State, 444 N.E.2d 296, 301 (Ind. 1983)). Importantly, the present case is completely unlike Dexter, in which the judgment presented by the State to support the habitual offender adjudication had not been signed at all. See id. Here, a judicial officer signed the judgment, and that judgment was never challenged at trial or on appeal as being improper.

23

Under these facts and circumstances, we conclude that the State presented evidence sufficient for the trial court[7] to conclude that Smith had in fact been convicted of robbery in 2003, and there was therefore sufficient evidence to support Smith's adjudication as an habitual offender.

**Conclusion**

The trial court did not abuse its discretion in granting the State's motion to continue so that the State could procure the testimony of a necessary witness. The trial court also did not abuse its discretion in the admission of the evidence regarding the shots fired and casings found, the evidence obtained during the execution of the search warrant, or the DNA evidence obtained from the buccal swab. Lastly, the State presented evidence sufficient to support the trial court's determination that Smith was an habitual offender.

Affirmed.

KIRSCH, J., and CRONE, J., concur.

---

[7] As noted above, Smith waived his right to have a jury determine his habitual offender status.