# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 24 2018, 6:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Vincent M. Campiti
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Supervising Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| James Carter III, | October 24, 2018 |
| *Appellant-Defendant,* | Court of Appeals Case No. 71A05-1709-CR-2248 |
| v. | Appeal from the St. Joseph Superior Court |
| State of Indiana, | The Honorable Jane Woodward Miller, Judge |
| *Appellee-Plaintiff.* | Trial Court Cause No. 71D01-1601-F3-1 |

**Altice, Judge.**

[1] Following a July 2016 jury trial, James Jarrell Carter III was found guilty of Level 6 felony pointing a firearm, but the jury deadlocked on four other charges. About a year later, Carter was retried by jury and found guilty on the four counts: Level 1 felony attempted murder; two counts of Level 5 felony battery with a deadly weapon; and Level 5 felony criminal recklessness. The trial court entered judgment of conviction and sentenced Carter on the attempted murder and pointing a firearm counts only. Carter now appeals and raises the following two restated issues:

> I. Whether the trial court abused its discretion when during the second jury trial it admitted into evidence testimony from a witness that Carter pointed a firearm at him; and

> II. Whether the State presented sufficient evidence to support his conviction for attempted murder.

[2] We affirm.

## Facts & Procedural History

[3] Around 10:00 or 11:00 p.m. on January 2, 2016, Carter's sister, Zykayia Carter, reported to police that her car, a Nissan sedan, had been stolen. That same night, four juvenile girls were "hanging out" together at a home in South Bend. *Transcript Vol. II* at 71, 112. The youths were at the home of A.S., age twelve, and her sister, A.S.2, age thirteen. Two other girls, A.M. and B.P., who were also sisters, were at the house as well. Around midnight, three juvenile males, who were a year or two older than the girls, came over to the house at the girls' invitation. At some point, one of the males, Q.J., left for a couple of minutes

and came back in a car, which was a Nissan sedan. The four females got into the car, with Q.J. driving. A.S. sat in the front passenger seat, B.P. behind her in the back seat, A.S.2 in the middle of the back seat, and A.M. on the driver's side in the back seat.

[4] After a minute or two, a vehicle sped up behind them. A.S.2 described that what looked like "a red van" followed them as they made several turns and, when she looked back, she observed "somebody pointed something out the window." *Id.* at 118. Believing it to be a gun, A.S.2 told the other occupants, "there's a gun" and A.S.2 heard "metal pieces hit the back" of the car. *Id.* A.S. recalled that "everyone was screaming" and she "ducked" down in her seat. *Id.* at 58. At that point, Q.J. began driving "fast down the street" and then crashed into a parked truck near Harrison and California Streets. *Id.* at 59. All the occupants jumped out of the car and ran, except A.S., who was pinned by an inflated airbag.

[5] A.S. opened her front passenger-side door, and a woman, later identified as Jacquise Carter, who is Carter and Zykayia's sister, came from the rear of the car and started punching and kicking A.S. in the face. While that was happening, a man, later identified as Carter, came up and put a gun to A.S.'s head and told A.S. that he was following the car "[b]ecause it was his sister's car." *Id.* at 62. Meanwhile, A.S.2 returned to the scene and saw Jacquise "beating up" A.S. *Id.* at 122. At some point, A.S. got out of the car. At that time, A.S. and A.S.2 tried to show Carter pictures of Q.J. that they had on their

phones because Carter was asking them who had been driving the car and "to tell [Carter] we didn't steal the car." *Id.* at 64.

[6]     Meanwhile, at around 12:30 a.m., Gerald Wellborn heard about "a dozen or so gunshots go off," so he looked out of his bedroom window and saw a car being chased by two other vehicles. *Transcript Vol. III* at 89. He watched as "the lead vehicle" crashed into his truck that was parked in front of his house. *Id.* Wellborn, who was familiar with the sound of gunfire, described the gunfire as "a high caliber and a low caliber being fired" in quick succession. *Id.* Wellborn heard someone screaming for help, so, with his phone in hand to call 911, he opened his front door intending to go outside. Wellborn saw a man, Carter, standing about fifteen feet away on the sidewalk in front of Wellborn's house, near "a dark red, dark maroon" minivan-type of vehicle. *Id.* at 94. Over Carter's objection, Wellborn testified, "[A]s soon as I get to open my door there was somebody with a gun, and he turned around and pointed it at me in a way that I thought I was going to be shot at."[1] *Id.* at 90. At the same time, Carter told Wellborn "to get the f*ck back inside" his house. *Id.* Wellborn recognized the gun as an AK-47, and upon seeing it, he "pretty much hit the floor," crawled back inside, and called 911. *Id.* at 92.

[7]     Out of concern that someone was hurt, Wellborn armed himself with a holstered gun and went back outside. He saw Carter again, but this time,

_____

[1] Carter had filed a motion in limine to exclude evidence that Carter pointed a gun at Wellborn. The trial court denied the motion but directed that the record reflect Carter's continuing objection to the evidence.

Carter did not have a gun and acted as though he was not the same person who had just pointed a gun at Wellborn. Wellborn recalled that after he made it clear to Carter that he knew he was the one who had pointed the gun at him, Carter "actually tried to shake my hand and apologize." *Id.* at 95. Carter explained to Wellborn that his "kid sister had been kidnapped by a group of people and that was the reason why he was chasing them down and shooting them." *Id.* at 96. Wellborn talked to Carter for approximately ten to fifteen minutes, and then Carter walked away before police arrived. During this time, Wellborn saw a couple of women in the street along with a large, white Suburban-type vehicle. The red minivan and the white SUV left before police arrived.

[8] South Bend Police Department (SBPD) Officer Luke Pickard responded around 12:40 a.m. to a report of shots fired. Prior to being dispatched, he had heard "several gunshots" and had already started moving to the area when he was dispatched. On his way, he encountered two crying and screaming female juveniles in the street, later identified as B.P. and A.S.2., both of whom had gunshot wounds. A.S.2 had what appeared to be a gunshot wound to her shoulder and B.P. also had an apparent gunshot wound to her shoulder as well as a laceration to the side of her head. After summoning medical assistance, Officer Pickard went to the scene of the accident, a couple of blocks away, and he met with and took a statement from Wellborn.

[9] SBPD Officer Eric Mentz also responded to the crash scene and, upon arriving, he realized that the sedan involved in the accident was the car for which a few

hours prior he had taken the motor vehicle theft report from Zykayia. SBPD Officer Paul Daley retrieved six 7.62 x 39-millimeter shell casings in a one-block area leading up to the crash site. Ray Wolfenbarger, a firearm and toolmark examiner for SBPD, testified that 7.62 x 39 caliber ammunition is "normally associated with the AK 47 or the SKS style" of rifle. *Id.* at 55. He explained that, while many other types of weapons also could fire that ammunition, a smaller number would have the rifling pattern that he found on the retrieved shell casings. The Nissan was towed to the SBPD's evidence processing location because "it had some ballistic damage to the rear." *Transcript Vol. II* at 158. SBPD Officer Andrew Jackson also responded to the scene and learned that Jacquise had a maroon-colored van registered in her name, and within hours after the crash, the van was located and impounded.

[10] SBPD Detective James Taylor testified that he interviewed Carter a few days after the incident, and Carter stated that he never left his home that night. Eventually Detective Taylor obtained a search warrant for Carter's phone, which revealed that, two days after the incident, Carter had obtained a "factory reset" of his phone such that it was "totally wiped and started over." *Transcript Vol. III* at 22. A search warrant for cell phone towers in the area of the chase and crash showed that Carter's phone was "bouncing off two different cell phone towers in that area" on the date and time in question. *Id.* at 23.

[11] On January 6, Wellborn identified Carter in a photo array and was "110 percent" confident in his identification. *Id.* at 98. A.S. did not identify Carter in a photo lineup presented to her within days after the incident, but several

days after that, A.S. saw Carter's face on television news and identified him as the person who had put the gun to her head.

[12] In January 2016, the State filed criminal charges against Carter, which it later amended, charging Carter as follows: Count I, Level 1 felony attempted murder; Count II, Level 5 felony battery with a deadly weapon; Count III, Level 5 felony battery with a deadly weapon; Count IV, Level 5 felony criminal recklessness; Count V, Level 6 felony pointing a firearm; and it also alleged that Carter was a habitual offender. A jury trial was held in June 2016, and the jury found Carter guilty of Count V, pointing a firearm, but it deadlocked on Counts I, II, III, and IV, resulting in a mistrial on those charges. The trial court withheld entering judgment of conviction on Count V at that time.

[13] In July 2017, Carter was retried on Counts I, II, III, and IV. During trial, Carter filed a motion in limine to exclude "[a]ny evidence that James Carter pointed a firearm at Gerald Wellborn" and any evidence that he had been convicted of Level 6 felony pointing a firearm. *Appellant's Appendix Vol. 6* at 22. Prior to Wellborn testifying, and out of the jury's presence, counsel for both parties presented argument to the trial court on the issue. Carter's counsel conceded that it would be acceptable for Wellborn to testify that he looked outside and saw Carter on his sidewalk holding a gun and to describe the gun that Carter was holding – as that would go to identification of Carter – but he argued that Wellborn should not be allowed to testify that Carter pointed the gun at him because that referred to another crime, which was not being tried in the current trial, and because its prejudicial effect outweighed any probative

value. The trial court denied the motion, finding, among other things, that the evidence that Carter pointed the firearm at Wellborn "reflects this defendant's state of mind," and it "provide[s] context to and informs [] Mr. Wellborn's ability to both identify the defendant and identify the weapon[.]" *Transcript Vol. III* at 8-9. The trial court also determined:

> The reality is if we look at 404(b), and I'm just using this as an analogy, a lot of information can go in or a lot of testimony can go in under 404(b) that is a crime, but its probative value outweighs the prejudicial value.
>
> And I think we're in a unique situation here, because this has been tried twice. And what we learned from the first trial is that a jury can sort out testimony of a gun being pointed at someone to battery charges and an attempted murder charge and a criminal reckless charge, because that's exactly what they did in the last trial. They convicted Mr. Carter of pointing a gun, hung on the other counts. So clearly they were able to separate out that testimony.

*Id*. at 9.

[14] The jury found Carter guilty of the four charged offenses and Carter pled guilty to the habitual offender count. The trial court entered judgment of conviction on Count I, attempted murder, and Count V, pointing a firearm and sentenced Carter to thirty-five years on Count I, enhanced by six years due to the habitual offender findings, and to a consecutive sentence of one and one-half years on Count V, for a total sentence of forty-two and one-half years. Carter now appeals.

# Discussion & Decision

## I. Admission of Evidence

[15] Carter argues that the trial court abused its discretion when, during the second trial, it permitted Wellborn to testify that Carter pointed a gun at him. Specifically, he maintains that the evidence that Wellborn saw Carter point the firearm at him was irrelevant to the charges presented to the jury in the second trial and, even if relevant, such relevance was outweighed by the danger of unfair prejudice. The admission of evidence is within the sound discretion of the trial court, and we review the court's decision only for an abuse of that discretion. *Smith v. State*, 982 N.E.2d 393, 402 (Ind. Ct. App. 2013), *trans. denied*. The trial court abuses its discretion only if its decision is clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law. *Id*.

[16] "Relevant evidence" is defined as "evidence having *any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ind. Evidence Rule 401 (emphasis added). In order to be relevant, the evidence at issue "need only have some tendency, however slight, to make the existence of a material fact more or less probable, or tend to shed any light upon the guilt or innocence of the accused." *Smith*, 982 N.E.2d at 402 (citing *Simmons v. State*, 717 N.E.2d 635, 638 (Ind. Ct. App. 1999)). Under Ind. Evidence Rule 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading

the jury, undue delay, or needlessly presenting cumulative evidence. *Snow v. State*, 77 N.E.3d 173, 179 (Ind. 2017). This balancing is committed to the trial court's discretion. *Id.*

[17] Here, Wellborn heard about "a dozen or so gunshots" in quick succession, some of which were fired by what Wellborn believed was a high-caliber gun. *Transcripts Vol. III* at 89. He looked out of his bedroom window and saw a car being chased by two other vehicles and observed as the lead vehicle crashed into his truck in front of his home. Wellborn opened his door and, before he took a step outside he saw Carter holding an AK-47. Carter immediately told Wellborn "to get the f*ck back inside" his house. *Id.* at 90. At this time, Carter was standing about fifteen feet away from Wellborn and near the maroon minivan-type vehicle. The evidence challenged by Carter was Wellborn's testimony that Carter pointed the firearm at him and did so in a way that Wellborn "thought [he] was going to be shot at." *Id.* The trial court found, and we agree, that Wellborn's testimony in this regard was relevant as it reflected Carter's aggressive state of mind immediately after the chase, gunshots, and crash, and it was relevant to Wellborn's ability to identify Carter and the type of weapon he was carrying.

[18] We also reject Carter's claim that the testimony should have been excluded due to its prejudicial effect. As this court has recognized, "'[a]ll evidence that is relevant to a criminal prosecution is inherently prejudicial, and thus the Evidence Rule 403 inquiry boils down to a balance of the probative value of the proffered evidence against the likely unfair prejudicial impact of that

evidence.'" *Smith*, 982 N.E.2d at 402 (quoting *Duvall v. State*, 978 N.E.2d 417, 428 (Ind. Ct. App. 2012)). Here, the jury knew that, after the gunshots and car crash, Wellborn saw Carter standing on his front sidewalk, by the maroon van that had been chasing the sedan, and Carter, while holding the AK-47, directed Wellborn to get "the f*ck back inside" his house. *Transcript Vol. III* at 90. Carter has not shown that Wellborn's additional statement that Carter pointed the gun at him was unduly prejudicial. Accordingly, we find no abuse of discretion with the trial court's decision to allow Wellborn's testimony that he saw Carter point the AK-47 at him.

[19]　Moreover, even if we were to agree with Carter that the relevance of this evidence was outweighed by the danger of unfair prejudice, any error in the admission of this evidence would have been harmless. An error in the admission of evidence is harmless if a conviction is supported by substantial independent evidence of guilt so that there is no substantial likelihood the challenged evidence contributed to the conviction. *Smith*, 982 N.E.2d at 403 n.3. Here, evidence showed that Carter had a motive for the shooting, that he was present at the scene and held a gun to A.S.'s head, that shortly after the gunshots and car crash, Carter was seen holding an AK-47, which was consistent with the shell casings found at the scene, that he admitted to Wellborn that he had just fired shots at the vehicle, that he lied to the police about his whereabouts, and that two days after the shooting, he had his cell phone factory-reset to wipe its contents. Accordingly, we find that, even without the challenged evidence, there was substantial independent evidence of

guilt supporting Carter's convictions and any error in the admission of evidence was harmless.

## II. Sufficiency

[20]     Carter argues that the evidence was insufficient to support his conviction for attempted murder.[2] Our standard of review with regard to sufficiency claims is well settled. In reviewing a sufficiency of the evidence claim, this court does not reweigh the evidence or judge the credibility of the witnesses. *Perez v. State*, 872 N.E.2d 208, 212-13 (Ind. Ct. App. 2007), *trans. denied*. We consider only the evidence most favorable to the verdict and the reasonable inferences drawn therefrom and will affirm if the evidence and those inferences constitute substantial evidence of probative value to support the judgment. *Id*. at 213. Reversal is appropriate only when reasonable persons would not be able to form inferences as to each material element of the offense. *Id*. A conviction may be based solely on circumstantial evidence. *Id*. Although presence at a crime scene alone is insufficient to sustain a conviction, presence combined with other facts and circumstances, including defendant's course of conduct before,

---

[2] Carter's brief also asserts that the evidence was insufficient to convict him of Counts II, III, and IV. However, as the trial court did not enter judgment of conviction or sentence Carter on those counts, we address only the sufficiency for the conviction on Count I, attempted murder. Furthermore, Carter's argument as to sufficiency is the same for all counts, namely, that "no evidence supporting the allegation that Mr. Carter was the alleged shooter was offered that could sustain a verdict of guilty beyond a reasonable doubt"; in our decision today, we reject that claim. *Appellant's Brief* at 14. Carter does not challenge the sufficiency of the evidence of his pointing a firearm conviction.

during, and after the offense, may raise a reasonable inference of guilt. *Maul v. State*, 731 N.E.2d 438, 439 (Ind. 2000).

[21] To convict Carter of attempted murder the State was required to prove that Carter, with intent to commit murder, "fire[d] multiple shots into a vehicle at B.P and/or A.S. and/or A.S.2 and/or Q.J. and/or A.M. Q.J. [and] that act constituted a substantial step toward the commission of the crime of [m]urder[.]" Ind. Code §§ 35-41-5-1, 35-42-1-1; *Appellant's Appendix Vol. 4* at 5. Carter's argument on appeal is that there was no evidence that he was the shooter. He argues that "no witness can place [him] inside either of the two vehicles Wellborn said he saw chasing the lead car" and "[n]othing was offered to distinguish Mr. Carter from anyone else in the vehicles during the chase and nothing was offered to distinguish any occupant from another with regard to being a shooter." *Id.* at 14-15. We disagree.

[22] Upon hearing the high-caliber gunshots, Wellborn looked out and watched the sedan being chased by two vehicles including a maroon minivan, which was owned by Carter's sister, Jacquise. After the crash, Wellborn opened his front door and saw Carter standing on his front sidewalk holding an AK-47, which matched the ammunition and rifling pattern found on the six shell casings found on the ground in a one-block area leading up to where the sedan crashed into the parked truck. Carter angrily told Wellborn "to get the f*ck back inside" his house, and then moments later, when Wellborn went outside, Carter acted as though he was not the same person who had just instructed Wellborn to get back inside while pointing a gun at him. *Transcript Vol. III* at 90. When

Wellborn indicated that he knew Carter was the same person who had just pointed the gun at him, Carter offered the explanation that he had been shooting at the sedan because his "kid sister had been kidnapped by a group of people and that was the reason why he was chasing them down and shooting them." *Id.* at 96. A.S. testified that Carter held a gun to her head and told her that the vehicle was "his sister's car." *Transcript Vol. II* at 62. The sedan had ballistic damage to the rear, and two of the occupants suffered gunshot wounds to the back of their shoulders. Although Carter told police he did not leave home that night, cell phone tower records indicate that his phone was used in the area on the date and time in question.

[23] Essentially, Carter's argument boils down to the premise that no one saw him inside one of the vehicles that was chasing the sedan or saw him shooting. However, a conviction may be based upon circumstantial evidence alone. *Perez*, 872 N.E.2d at 213. Carter suggests that, from the evidence presented, one could reasonably conclude that a different person fired the shots or that when the vehicles came to rest "Carter exited whichever vehicle he was in" and "retrieved the weapon from someone else." *Appellant's Brief* at 16. As our Supreme Court has determined, "It is not necessary that the evidence 'overcome every reasonable hypothesis of innocence.'" *Sallee v. State*, 51 N.E.3d 130, 133 (Ind. 2016) (quoting *Moore v. State*, 652 N.E.2d 53, 55 (Ind. 1995)). Based on the record before us, we find that the State presented sufficient evidence to convict Carter of attempted murder.

[24] Judgment affirmed.

Brown, J. and Tavitas, J., concur.