**Pursuant to Ind. Appellate Rule 65(D),
this Memorandum Decision shall not be
regarded as precedent or cited before
any court except for the purpose of
establishing the defense of res judicata,
collateral estoppel, or the law of the case.**



FILED

Aug 07 2014, 6:25 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**BRUCE W. GRAHAM**
Graham Law Firm P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**J.T. WHITEHEAD**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| RIO MICHAELS, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 79A04-1311-CR-559 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Randy J. Williams, Judge
Cause No. 79D01-1207-FC-28

**August 7, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BRADFORD, Judge**

# CASE SUMMARY

Following a bifurcated jury trial, Appellant-Defendant Rio Michaels was convicted of Class C felony carrying a handgun without a license with a prior felony and Class D felony criminal recklessness. Michaels was subsequently sentenced to an aggregate ten-year term, with eight years executed in the Department of Correction ("DOC") and two years suspended to probation. On appeal, Michaels raises several issues, which we restate as follows: (1) whether Appellee-Plaintiff the State of Indiana (the "State") presented sufficient evidence to negate Michaels's proffered necessity defense, (2) whether the trial court abused its discretion in denying Michaels's stand-by counsel's request for a continuance, (3) whether the evidence is sufficient to sustain the elevation of Michaels's conviction for carrying a handgun without a license to a Class C felony, and (4) whether Michaels's due process rights were violated by the alleged failure to promptly bring Michaels before the trial court for an initial hearing. We affirm.

## FACTS AND PROCEDURAL HISTORY

### A. Factual Overview

### 1. Version of Events Presented by the State's Witnesses

On the afternoon of June 30, 2012, Angie Fassnacht and her boyfriend, Richard Fisher, were working on a house owned by Fassnacht's mother that was located at 1201 Washington Street in Lafayette ("1201 Washington Street residence"). The 1201 Washington Street residence was located next door to Michaels's residence. While on the front porch of the 1201 Washington Street residence, Fassnacht saw Michaels shoot a gun

2

into the air. At the time Michaels shot the gun into the air he shouted "something about Joe." Tr. p. 165. Fassnacht was scared after Michaels shot the gun into the air, and she quickly "ran to [her] car." Tr. p. 161. Fassnacht later explained that she was "running for cover [because she] didn't know what [Michaels's] intentions were." Tr. p. 167. After getting into her vehicle, Fassnacht saw Michaels run to the back of his residence. After also hearing the gunshot, Fisher exited the 1201 Washington Street residence and joined Fassnacht in her vehicle. Fassnacht then called 911.

### 2. *Version of Events Presented by the Defense's Witnesses*

On the afternoon of June 30, 2012, Michaels's wife, Anna, was in a back bedroom of the home she shared with Michaels. Suddenly, Anna heard "some kicking at the bottom" of the back door. Tr. p. 230. Michaels was in the restroom at the time. Anna shouted "who is it like three times." Tr. p. 230. After receiving no response, Anna grabbed her pistol from her top dresser drawer, went to the back door, and flung the door open. When she opened the door, Anna saw a "tall, African American" man who was wearing a red "jersey style" shirt with "some kind of like shorts with the big cargo pockets on the side." Tr. p. 234. Anna believed that Fisher was the man kicking on her back door. Anna "fired off a round, pointed at the ground, and the guy was already tearing off across the back of the yard." Tr. p. 233. Anna later indicated that she reacted by grabbing and ultimately firing the weapon because she suffers from "a little touch of post-dramatic stress disorder," Tr. p. 232, because she had prior experience with "about seven different stalkers," some of whom were not "too safe." Tr. p. 231. Anna then called 911.

3

### 3. Police Investigation

A number of officers from the Lafayette Police Department responded to the scene. Both Fassnacht and Anna separately described their version of the events in question to the investigating officers. Anna initially told investigating officers that she thought she put the weapon back on the dresser after the incident, but stated that she could not be sure because she "was freaking out, I was crying, I was shaking bad … I was just trembling like this and I was just on auto pilot at that point." Tr. p. 235. Anna subsequently indicated that Michaels took the weapon from her in order to protect their family because she was "holding that gun in the emotional state." Tr. p. 236.

When Officer Grant Davidson arrived on the scene, Michaels flagged him down. Michaels was nervous, spoke rapidly, and raised his hands as he informed Officer Davidson that he was carrying a handgun. Officer Davidson removed a black, semi-automatic gun from Michaels's front right pocket.

Consistent with Fassnacht's version of the events, investigating officers subsequently found a shell casing on the front porch of Michaels's residence. Investigating officers were not able to locate a shell casing in the backyard. Investigating officers observed no sign of damage to the back door of Michaels's residence.

### B. Procedural History

On July 9, 2012, the State charged Michaels with Class C felony carrying a handgun by a convicted felon, Class D felony criminal recklessness, and Class A misdemeanor carrying a handgun without a license. The Lafayette County Public Defender's Office

("Public Defender's Office") was initially appointed to represent Michaels in the underlying case on August 8, 2012. However, at some point Michaels indicated that he did not want to be represented by the Public Defender's Officer, but rather that he wished to proceed pro se. Following a hearing at which the trial court explained the pitfalls of self-representation and examined Michaels's ability to represent himself, the trial court granted Michaels's motion to proceed pro se. The trial court also appointed the Public Defender's Office to serve as stand-by counsel.

On July 10, 2013, during a hearing at which Michaels was present, the trial court noted on the record that trial was scheduled for August 20, 2013. At some point on or before August 13, 2013, Kevin O'Reilly was appointed as stand-by counsel on behalf of the Public Defender's Office. On this date, O'Reilly appeared as stand-by counsel during a pre-trial hearing. O'Reilly also appeared as stand-by counsel during a subsequent pre-trial hearing. During these pre-trial hearings, O'Reilly was exposed to Michaels's claimed defenses and apparent trial strategy.

Despite being notified of the August 20, 2013 trial date in open court, Michaels failed to appear for trial on the morning of August 20, 2013. In light of Michaels's failure to appear, the trial court found that Michaels had relinquished his right to appear pro se and appointed O'Reilly to represent Michaels at trial. O'Reilly then requested a continuance of trial. The trial court denied O'Reilly's request for a continuance, and the case proceeded to trial.

Following part one of a bifurcated trial, the jury found Michaels guilty of Class A

5

misdemeanor carrying a handgun without a license and Class D felony criminal recklessness. The matter then proceeded to part two of the bifurcated trial, after which the jury determined that Michaels had committed a prior unrelated felony within the preceding fifteen years. In light of this determination, Michaels's conviction for carrying a handgun without a license was elevated to a Class C felony.

## DISCUSSION AND DECISION

### I. Whether the State Sufficiency Negated Michaels's Proffered Necessity Defense

Initially we note that Michaels does not dispute that he possessed and carried a handgun without a license. Michaels, however, argues that he did so out of manifest necessity. On appeal, Michaels contends that the State presented insufficient evidence to negate his proffered necessity defense.

> In order to prevail on a claim of necessity, the defendant must show (1) the act charged as criminal must have been done to prevent a significant evil, (2) there must have been no adequate alternative to the commission of the act, (3) the harm caused by the act must not be disproportionate to the harm avoided, (4) the accused must entertain a good faith belief that his act was necessary to prevent greater harm, (5) such belief must be objectively reasonable under all the circumstances, and (6) the accused must not have substantially contributed to the creation of the emergency. *Toops v. State*, 643 N.E.2d 387, 390 (Ind. Ct. App. 1994). In order to negate a claim of necessity, the State must disprove at least one element of the defense beyond a reasonable doubt. *See Pointer v. State*, 585 N.E.2d 33, 36 (Ind. Ct. App. 1992) (discussing State's burden in the context of an analogous self-defense claim). The State may refute a claim of the defense of necessity by direct rebuttal, or by relying upon the sufficiency of the evidence in its case-in-chief. *Id.* The decision whether a claim of necessity has been disproved is entrusted to the fact-finder. *Id.* Where a defendant is convicted despite his claim of necessity, this court will reverse the conviction only if no reasonable person could say that the defense was negated by the State beyond a reasonable doubt. *Id.*

*Dozier v. State*, 709 N.E.2d 27, 29 (Ind. Ct. App. 1999).

In arguing that the State failed to present sufficient evidence to negate his proffered necessity defense, Michaels argues that he established each of the above-stated six factors. Specifically, he argues that he possessed the weapon to prevent a home intrusion; that given Anna's mental state, he had no adequate alternative but to take the weapon from her and possess the weapon himself; that there was no harm caused by his possession of the weapon; that he entertained a good faith objectively reasonable belief that his possession of the weapon was necessary to prevent a greater harm; and that he did not substantially contribute to the creation of the circumstances leading to his possession of the weapon. For its part, the State claims that it presented sufficient evidence to negate Michaels's claim of necessity.

> When reviewing whether the State presented sufficient evidence to negate a defendant's claim of necessity, we apply the same standard of review used for all sufficiency of the evidence questions. We neither reweigh the evidence nor judge the credibility of witnesses. *Johnson v. State*, 671 N.E.2d 1203, 1209 (Ind. Ct. App. 1996), *trans. denied*. Rather, we examine only the evidence most favorable to the State along with all reasonable inferences to be drawn therefrom. *Id*. If there is substantial evidence of probative value to sustain the conviction, then it will not be set aside. *Id*.

*Id*. at 30.

Upon review, we conclude that the State presented sufficient evidence of probative value to sustain Michaels's conviction for carrying a handgun without a license. Here, the State and the defense presented conflicting versions of the facts relating to the underlying incident. The State presented evidence establishing that Michaels possessed and fired the weapon while on the front porch of his residence, while the defense presented evidence

7

establishing that Michaels did not fire the weapon and only possessed the weapon after he took it from Anna who had fired it into the backyard.

Again, Fassnacht testified that on the afternoon of June 30, 2012, she saw Michaels fire a gun into the air. Anna, on the other hand, testified that she fired the weapon into the back yard of her and Michaels's residence after she heard someone kicking on the back door of the residence. Anna also suggested that Michaels only possessed the weapon out of a manifest necessity to protect their family. In this regard, Anna testified that after shooting the weapon, she was "freaking out," crying, "shaking bad", and trembling. Tr. p. 235. She further testified that Michaels took the weapon from her after she shot it into the backyard because she was a danger to herself and others so long as she continued to hold the weapon while in such an emotional state.

The jury, acting as the fact finder, was free to judge witness credibility and believe or not believe the witnesses as it saw fit. *See Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004); *McClendon v. State*, 671 N.E.2d 486, 488 (Ind. Ct. App. 1996); *Moore v. State*, 637 N.E.2d 816, 822 (Ind. Ct. App. 1994), *trans. denied*. In finding Michaels guilty, it appears that the jury disbelieved the version of the facts presented by Anna and Michaels's claimed necessity defense. The jury was free to do so. Michaels's claim on appeal is essentially an invitation to judge the credibility of the witnesses and reweigh the evidence, which we will not do. *See Dozier*, 709 N.E.2d at 30.

### II. Whether the Trial Court Abused Its Discretion By Denying Stand-By Counsel's Request for A Continuance

Michaels next contends that the trial court abused its discretion by denying his stand-by counsel's request for a continuance.

> The granting or denial of a continuance lies within the sound discretion of the trial court, and its decision will be disturbed only upon a showing that the court abused its discretion. *Woodfork v. State*, 594 N.E.2d 468, 470 (Ind. Ct. App. 1992). This burden is met when a defendant demonstrates that he was prejudiced by the court's denial of his request for a continuance. *Id.* Continuances to allow more time for preparation are generally disfavored in criminal cases, granted only upon a showing of good cause and in the furtherance of justice. *Hazelwood v. State*, 609 N.E.2d 10, 13 (Ind. Ct. App. 1993), *trans. denied*.

*Sublett v. State*, 665 N.E.2d 621, 623 (Ind. Ct. App. 1996). In addition, a specific showing is required as to how the additional time requested would have aided counsel. *Jones v. State*, 701 N.E.2d 863, 871 (Ind. Ct. App. 1998).

In claiming that the trial court abused its discretion in denying his stand-by counsel's request for a continuance, Michaels essentially argues that his stand-by counsel was denied adequate time to prepare for trial. While the right to counsel includes reasonable preparation time, the Indiana Supreme Court has stated that there is no minimum period of time which must be allowed by the court. *Marshall v. State*, 438 N.E.2d 986, 988 (Ind. 1982). The adequacy of time allowed for preparation must be determined on a case by case basis, considering the totality of the circumstances. *Id.* (citing *Jones v. State*, 175 Ind. App. 343, 345, 371 N.E.2d 1314, 1316 (1978)).

In the instant matter, the State charged Michaels with the underlying criminal offenses on July 9, 2012. The Public Defender's Office was initially appointed to represent Michaels in the underlying case on August 8, 2012. However, at some point Michaels indicated that he

9

did not want to be represented by the Public Defender's Officer, but rather that he wished to proceed pro se. At some point on or before August 13, 2013, Kevin O'Reilly was appointed as stand-by counsel on behalf of the Public Defender's Office. On this date, O'Reilly appeared as stand-by counsel during a pre-trial hearing. O'Reilly also appeared as stand-by counsel during a subsequent pre-trial hearing. During these pre-trial hearings, O'Reilly was exposed to Michaels's claimed defenses and apparent trial strategy.

Despite being notified of the August 20, 2013 trial date in open court, Michaels failed to appear for the start of trial on the morning of August 20, 2013. In light of Michaels's failure to appear, the trial court found that Michaels had relinquished his right to appear pro se and appointed O'Reilly to represent Michaels at trial. O'Reilly then requested a continuance of trial. In making this request, O'Reilly acknowledged that he had been stand-by counsel for "a couple of weeks" and that the Public Defender's Office had been stand-by counsel for "a couple of months." Tr. p. 94. O'Reilly asserted that despite this association with Michaels's case, "there [were] several things that [he] would have done" had he been actively representing Michaels. Tr. p. 94. O'Reilly stated that

> At a minimum I would have deposed the State's eye witness in this case, uh, two or three of the police officers I can think of, probably would have wanted to depose them. There are some witnesses I would have subpoenaed. Obviously as stand-by counsel it wasn't appropriate for me to take those actions so there's a lack of preparation. I understand Judge, that the purpose of stand-by counsel is to be able to step in and take over in the event the defendant is unable or unwilling to proceed. Uh, and if, in the normal case he would be removed but he still would be available to consult, to advise me concerning the facts, uh, to, to kind of back me up as far as evidence and what happened and I could consult him throughout the trial. Obviously Mr. Michaels is not here so we have a combination, Judge, and I think an unusual combination of a lack of preparation and the absence of the defendant. Uh,

both of those things co-existing puts me in a position where I don't know if it will be possible to provide effective assistance of counsel if this trial were to proceed today.

Tr. pp. 94-95.

The trial court denied O'Reilly's request for a continuance, finding as follows:

I understand that this is an unusual situation. One which I could not find in any, any review of the law and I believe counsel has also taken a look to see if this specific issue had arisen. Uh, we may be making law today. However, I believe that in the absence of the stand-by counsel, there would be no basis to continue to trial. The defendant had been notified. He has the absolute right not to appear for his trial. That we have an attorney who can move in in his stead, that as, as counsel, I believe will provide the defendant with more, with better representation at this point than he would have had in the absence of any counsel, be it through the process of voir dire, cross-examination. For in the absence of any counsel, we would proceed with the State and that would be all. I think the defendant, therefore, has, is better representation today by Mr. O'Reilly sitting in than the defendant would have had, had the Court proceeded with a completely empty defense table. If you need a few minutes Mr. O'Reilly, we can do that.

Tr. pp. 96-97. The case then proceeded to trial.

During trial, O'Reilly represented Michaels in a manner which demonstrated that he had knowledge of Michaels's version of the facts of the case as well as Michaels's claimed defenses and planned trial strategy. Specifically, O'Reilly elicited testimony from Michaels's wife Anna that established Michaels's version of the events in question. O'Reilly also elicited testimony from Anna which supported Michaels's claimed defense that he only possessed the weapon out of necessity to protect himself and his family.

During questioning by O'Reilly, Anna testified that on the date in question, she was in a back bedroom and Michaels was in the restroom when she heard "some kicking at the

11

bottom" of the back door. Tr. p. 230. Anna shouted "who is it like three times." Tr. p. 230. After receiving no response, Anna grabbed her pistol from her top dresser drawer, went to the back door, and flung the door open. Anna stated that when she opened the door, she saw a "tall, African American" man who was wearing a red "jersey style" shirt with "some kind of like shorts with the big cargo pockets on the side." Tr. p. 234. Anna further testified that she believed that Fisher was the man kicking on her back door.

Anna testified that she "fired off a round, pointed at the ground, and the guy was already tearing off across the back of the yard." Tr. p. 233. Anna further testified that she was ultimately able to find the shell from the bullet which she claimed to have fired into the backyard. O'Reilly presented the shell which Anna claimed to have shot into the backyard and successfully argued for its admission into evidence over the State's objection. Anna testified that she reacted by grabbing and ultimately firing the weapon because she suffers from "a little touch of post-dramatic stress disorder," Tr. p. 232, because she had prior experience with "about seven different stalkers," some of whom were not "too safe." Tr. p. 231.

Anna admitted that she told investigating officers that she thought she put the weapon back on the dresser after the incident, but stated that she could not be sure because she "was freaking out, I was crying, I was shaking bad … I was just trembling like this and I was just on auto pilot at that point." Tr. p. 235. Anna also testified that Michaels took the weapon from her. Anna's testimony suggested that Michaels took the weapon from her out of necessity to protect their family because Anna was a danger as she was "holding that gun in

12

the emotional state." Tr. p. 236.

In addition to Anna's above-stated testimony, O'Reilly questioned various other defense witnesses, including Anna's two daughters, who testified in a manner consistent with Michaels's apparent planned strategy during trial. Through these numerous defense witnesses, O'Reilly presented facts supporting Michaels's version of the events, and developed Michaels's claimed defenses. O'Reilly also cross-examined the State's witnesses in an attempt to raise questions about the witness' credibility.

Michaels has not asserted on appeal how additional time would have enabled O'Reilly to better present his version of the events or his claimed necessity defense. Michaels has failed to make a specific showing as to (1) how additional time would have aided O'Reilly's representation of him or (2) what O'Reilly could have done differently had the continuance been granted. In addition, Michaels has failed to demonstrate how he was prejudiced by the trial court's denial of O'Reilly's motion for continuance.

The trial court was in the best position to evaluate the fairness of the proceedings, and, upon review, we cannot conclude the trial court's denial of Michaels's motion for a continuance was an abuse of discretion. *See generally Jones*, 701 N.E.2d at 871 (providing that the court on appeal could not conclude that the trial court abused its discretion in denying defendant's motion for a continuance because defendant failed to show how additional time would have aided her defense or how she was prejudiced by denial of her request for a continuance). As such, in light of Michaels's failure to demonstrate prejudice, we conclude that the trial court acted within its discretion when it denied O'Reilly's request

13

for a continuance.

### III. Whether the Evidence Is Sufficient to Sustain the Elevation of Michaels's Conviction for Carrying a Handgun Without a License to a Class C Felony

Michaels next contends that the evidence is insufficient to sustain the elevation of his conviction for carrying a handgun without a license from a Class A misdemeanor to a Class C felony. Specifically, Michaels claims that the evidence is insufficient to sustain the jury's determination that he had been convicted of a felony during the fifteen years preceding the date that the instant offense was committed.

Indiana Code section 35-47-2-1 provides, in relevant part, that a person "shall not carry a handgun in any vehicle or on or about the person's body without being licensed under this chapter to carry a handgun." Indiana Code section 35-47-2-23(c) further provides that a person who violates Indiana Code section 35-47-2-1 commits a Class A misdemeanor. However, the offense is a Class C felony if the person "has been convicted of a felony within fifteen (15) years before the date of the offense." Ind. Code § 35-47-2-23(c).

"For almost 30 years, this Court has held that the State *must* introduce into evidence proper certified and authenticated records of the defendant's prior felony convictions in order to prove beyond a reasonable doubt the existence of those prior convictions." *Dexter v. State*, 959 N.E.2d 235, 238 (Ind. 2012) (emphasis in original). However,

> "[a] defendant may not wage a collateral attack on the validity of a prior conviction during a habitual-offender proceeding unless the court documents on their face raise a presumption that the conviction is constitutionally infirm and the apparent constitutional infirmity undermines the integrity and reliability of the guilt determination."

14

*Smith v. State*, 982 N.E.2d 393, 409 (Ind. Ct. App. 2013) (quoting *Dexter*, 959 N.E.2d at 238), *trans. denied*; *see generally Gross v. State*, 444 N.E.2d 296, 301 (Ind. 1983) (providing that any technical irregularity in the manner of entering a judgment of commitment does not render that judgment void and any challenge thereto must be asserted in the court where the judgment was entered). We believe that the same is true for a challenge to an enhancement to the level of crime committed that is predicated on a prior conviction.

Here, in order to prove that Michaels had been convicted of a felony within the preceding fifteen years, the State submitted into evidence State's Exhibit 16. State's Exhibit 16 is a certified copy of a Judgment of Conviction from the State of Wisconsin. Pursuant to Wisconsin law, the Judgment of Conviction was signed by the clerk of the court. *See* Wis. Stat. § 972.13(4). The Judgment of Conviction demonstrated that Michaels was convicted of felony burglary in Milwaukee County, Wisconsin in December of 2011.

In challenging the sufficiency of the Judgment of Conviction to sustain the Class C felony enhancement, Michaels does not contest that the Judgment of Conviction is valid under Wisconsin law. Rather, he argues that the Judgment of Conviction is insufficient to prove that he was convicted of the Wisconsin felony burglary because it was not signed by the trial judge. In support, Michaels cites to the Indiana Supreme Court's opinion in *Dexter*, which provides that in order to constitute substantial evidence of probative value sufficient to sustain a habitual-offender enhancement, a judgment of conviction entered in Indiana courts must be signed by the trial judge. 959 N.E.2d at 239.

However, the requirements of Indiana judgments of conviction as outlined in *Dexter*

15

do not apply to the instant matter because the Judgment of Conviction at issue here was issued by a court of record outside of Indiana and complies with the requirements of that court. Indiana Code section 34-39-4-3(b) provides that properly authenticated records of judicial proceedings arising from a state other than Indiana "shall have full faith and credit given to them in any court in Indiana as by law or usage they have in the courts in which they originated." Again, here, the Judgment of Conviction was entered in a Wisconsin court. The Judgment of Conviction complies with Wisconsin Statute section 972.13(4), which provides that a judgment of conviction shall be "signed by the judge *or* clerk." (Emphasis added). The copy of the Judgment of Conviction admitted at Michaels's trial was properly certified and its admission was not challenged by Michaels. Because the Judgment of Conviction at issue here complies with the law of the jurisdiction in which it was entered, *i.e.*, Wisconsin, we conclude that it is sufficient to prove that Michaels was convicted of a prior felony and could be used to prove that Michaels had been convicted of a felony within the preceding fifteen years. Accordingly, we conclude that Michaels's claim in this regard is without merit.

#### IV. Whether the Alleged Failure to Promptly Bring Michaels Before the Trial Court for an Initial Hearing Resulted in a Violation of Michaels's Due Process Rights

Michaels last contends that his due process rights were violated because he was not promptly brought before the trial court for an initial hearing. In raising this contention, Michaels claims that "dismissal of this case would be appropriate to place everyone on notice that there are repercussions for failing to provide a prompt Initial Hearing in a warrantless arrest case." Appellant's Br. p. 21. We disagree.

16

Indiana Code section 35-33-7-1 provides that "[a] person arrested without a warrant for a crime shall be taken promptly before a judicial officer … for an initial hearing in court." During the initial hearing, the trial court is required to inform the accused of the nature of the charges against him, the amount and conditions of bail, his right to a speedy trial, the privilege against self-incrimination, and his right to retained or appointed counsel. *See Anthony v. State*, 540 N.E.2d 602, 604 (Ind. 1989). In *Griffith v. State*, 788 N.E.2d 835, 840 (Ind. 2003), the Indiana Supreme Court noted that the United States Supreme Court has specifically held that "a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein* [*v. Pugh*, 420 U.S. 103, 114 (1975)]."[1] 788 N.E.2d at 840 (citing *Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991)).

In addition, the Indiana Supreme Court has held that "'illegal arrest or detention does not void a subsequent conviction.'" *Sawyer v. Clark*, 576 N.E.2d 1254, 1255 (Ind. 1991) (quoting *Gerstein*, 420 U.S. at 119). Instead, the normal remedy for a violation of Indiana Code section 35-33-7-1 is the suppression of any evidence obtained during the unreasonable delay. *Stafford v. State*, 890 N.E.2d 744, 749 (Ind. Ct. App. 2008). The defendant bears the burden to prove the delay between his arrest and the initial hearing was both prejudicial and unreasonable. *See Anthony*, 540 N.E.2d at 605.

In the instant matter, the record demonstrates that Michaels was arrested on June 30,

[1] In *Gerstein*, the United States Supreme Court held that an individual detained following a warrantless arrest is entitled to a prompt judicial determination of probable cause as a prerequisite to any further restraint on his liberty. 420 U.S. at 114.

2012. He first appeared before the trial court on July 2, 2012. Following this appearance, Michaels remained incarcerated pending a formal initial hearing. On July 9, 2012, the trial court conducted a formal initial hearing. Also on July 9, 2012, the State charged Michaels with Class C felony carrying a handgun by a convicted felon, Class A misdemeanor carrying a handgun without a license, and Class D felony criminal recklessness.

Michaels claims that the delay between his arrest and his first appearance before the trial court was unreasonable. He also claims that the delay between his first appearance and the formal initial hearing was unreasonable. With respect to the alleged delay between the time of Michaels's arrest and his first appearance before the trial court, the record demonstrates that Michaels was brought before the trial court within approximately forty-eight hours of his arrest. Michaels was arrested on June 30, 2012, a Saturday. He was brought before the trial court on July 2, 2012, the following Monday. With respect to the alleged delay between Michaels's first appearance before the trial court and his formal initial hearing, the record demonstrates that the time that lapsed between the first appearance and the formal initial hearing included both Independence Day, a federal holiday, and a normal two-day weekend. Thus, the trial court was open, at most, three days between Michaels's first appearance before the trial court and his initial hearing.

Even assuming that the alleged delays were unreasonable, we conclude that Michaels has failed to prove that he was prejudiced by either of the alleged delays. Michaels does not point to any evidence that was admitted during trial which he claims was discovered during the alleged unreasonable delays. Likewise, he makes no argument regarding what benefit, if

18

any, the State reaped from the alleged delays. In light of Michaels's failure to prove that he was prejudiced by either of the alleged delays, we further conclude that Michaels has failed to demonstrate that his due process rights were violated by the alleged delays. *See Anthony*, 540 N.E.2d at 605 (providing that the defendant bears the burden to prove *both* that the alleged delay was unreasonable and that he was prejudiced by the alleged delay).

## CONCLUSION

In sum, we conclude that (1) the State presented sufficient evidence to negate Michaels's proffered necessity defense, (2) the trial court acted within its discretion in denying Michaels's stand-by counsel's request for a continuance, (3) the evidence is sufficient to sustain the elevation of Michaels's conviction for carrying a handgun without a license to a Class C felony, and (4) Michaels's due process rights were not violated by the alleged failure to promptly bring Michaels before the trial court for an initial hearing.

The judgment of the trial court is affirmed.

BARNES, J., and BROWN, J., concur.

19