## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 18 2017, 10:29 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

| APPELLANT PRO SE | ATTORNEYS FOR APPELLEE |
| --- | --- |
| Joe M. Meyers<br>Carlisle, Indiana | Curtis T. Hill, Jr.<br>Attorney General of Indiana |
| | Justin F. Roebel<br>Deputy Attorney General<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
| --- | --- |
| Joe M. Meyers,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | October 18, 2017<br><br>Court of Appeals Case No.<br>30A01-1609-PC-2265<br><br>Appeal from the Hancock Superior Court<br><br>The Honorable Terry Snow, Judge<br><br>Trial Court Cause No.<br>30D01-1608-PC-1377 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Joe Meyers (Meyers), appeals his conviction for murder, Ind. Code § 35-42-1-1(1); and kidnapping, a Level 3 felony, I.C.§ 35-42-3-2(a); as well as the summary dismissal of his petition for post-conviction relief.

We affirm.

# ISSUES

Meyers presents seven issues on appeal, which we consolidate and restate as the following five issues:

(1) Whether the search warrants relating to certain searches were properly issued, and the evidence recovered from those searches admissible;

(2) Whether the State presented sufficient evidence to support Meyers' convictions;

(3) Whether the trial court judge was required to recuse himself;

(4) Whether Meyers received ineffective assistance of counsel; and

(5) Whether the post-conviction court was required to issue specific findings of facts and conclusions of law in dismissing his post-conviction petition.

# FACTS AND PROCEDURAL HISTORY

In July of 2014, Meyers was staying at the Always Inn in Indianapolis, Indiana. Ronnie Westbrook (Westbrook), and Amanda Gonzales (Gonzales), who were

friends with Meyers, were also staying in the same hotel. Westbrook had rented several rooms at the hotel, and he shared his room with his "on and off" girlfriend, Gonzales. (Transcript Vol. V, p. 1010). On July 19, 2014, Westbrook spent the night in one of the rooms he had rented with Katrina Miller (Miller). During the night, Westbrook awoke to someone banging on the door. Upon opening the door, he saw Gonzales storming across the parking lot to the room occupied by Meyers. Westbrook closed the door and went back to bed. Moments later, Gonzales returned and began pounding on the door. This time, Miller answered the door and Gonzales entered the room asking Westbrook what he had been doing in the room with Miller. The two began arguing. The confrontation between Westbrook and Gonzales continued with Westbrook going to the hotel room he shared with Gonzales, but the couple returned to Miller's room, where they were joined by Meyers.

[5] Because Miller did not want to be involved in the conflict between Westbrook and Gonzales, she decided to leave. By that time, it was 6:00 a.m. Meyers offered to give Miller a ride and drop her off at the intersection at "30th and German Church" Road. (Tr. Vol. V, p. 1015). Gonzales, Miller, and Westbrook all sat in the back seat. As they drove, Westbrook leaned into his seat and Miller rested on him. At some point, Westbrook looked up and saw that they were on "Carroll Road," and that Meyers had driven past Miller's designated stop. (Tr. Vol. V, p. 1036). This fact caused Westbrook to get into an argument with Meyers, and Westbrook insisted to be let out of the vehicle. According to Westbrook, Meyers pulled over to the side of the road next to a

cornfield, where the two argued some more. Westbrook also saw Meyers and Gonzales look at each other suspiciously, and that is when he knew "something wasn't right." (Tr. Vol. V, p. 1036). Notwithstanding Westbrook's request to be let out, he did not get out of the vehicle at that point, and Meyers drove the vehicle back onto the road. However, as Meyers approached the intersection of 42nd Street and German Church Road, Westbrook again insisted to be let out of the vehicle. According to Westbrook, he did not worry about leaving Miller behind with Meyers and Gonzales because he knew she "always carried a firearm on her." (Tr. Vol. V, p. 1038). After Westbrook got out of Meyers' vehicle, Meyers, did a "U turn right there in street" and headed in the opposite direction on Carroll Road. (Tr. Vol. V, p. 1038). Westbrook, who was wearing a GPS-enabled ankle monitor, began walking towards German Church road. Meyers however, drove back to the cornfield on Carroll Road. There, Gonzales gave Meyers a .380 caliber Sig Sauer handgun and she encouraged him to shoot Miller. Meyers shot Miller in the back of the head. The two got inside the vehicle and drove back to the hotel; however, they stopped on the way and picked up Westbrook. The group arrived at the hotel at approximately 6:30 a.m.

[6] On July 24, 2014, Miller's decomposing body was found in a cornfield by two Mormon missionaries who telephoned the police. Subsequent investigations revealed that Miller had been shot in the back of the head with a .380 caliber bullet. There was a shell casing of a Hornady-brand .380 bullet near Miller's body. Miller also showed signs of having been beaten before being shot: she

had blunt-force trauma to the right side of her face and some of her teeth had been knocked out. She also had a contusion on her thigh.

[7] The discovery of Miller's body was announced on the local news. On July 25, 2014, Isadore Webster (Webster) and his girlfriend, Michelle Muse (Muse), who were residents at the Always Inn, went to the police station and informed the police that they had information regarding Miller's murder. Muse informed the police that she knew Miller and that Miller had stayed in the same hotel with different people from time to time. Muse advised the police that either on July 22 or July 23, 2014, Gonzales approached her and asked if she had ever seen a real murder take place. Muse told the police that she did not understand Gonzales' question. Gonzales explained to Muse that Meyers, Westbrook, Miller, and herself got into a vehicle and drove to a cornfield, where Meyers made Miller get down on her knees, and then Meyers shot Miller in the back of the neck. Webster, who was separately interviewed by the police, reiterated Muse's narration. Webster also informed the police that Gonzales and Meyers each carried firearms. Webster added that Gonzales was Westbrook's girlfriend.

[8] Based on the information gathered from Muse and Webster, the police went to the Always Inn, and inquired if Westbrook and Meyers were residents at the hotel. The Always Inn confirmed that Westbrook and Meyers had paid for rooms in advance, and the police obtained the surveillance video from the hotel. The surveillance video substantiated Muse's and Webster's account, and the police began to look for Gonzales, Westbrook, and Meyers. On July 26,

2014, the police obtained search warrants to search the rooms occupied by Gonzales, Westbrook, and Meyers. During the search of Meyers' hotel room, several items were discovered, including six unfired Hornady-brand .380 caliber bullets. On the same day, the police initiated a traffic stop of a green 2003 Ford Expedition driven by Meyers, and he was thereafter arrested. Following a search warrant application, at approximately 4:43 p.m. on the same day, the magistrate issued a search warrant authorizing the search of five vehicles, including Meyers' green 2003 Ford Expedition. A search of the green 2003 Ford Expedition yielded a .40 caliber Smith & Wesson handgun and a 12-gage shotgun. The next day, on July 27, 2014, the officers located and arrested Westbrook and Gonzales.

[9] Following Gonzales' arrest, the Hancock County Police Department received additional evidence about Miller's murder from an inmate housed at the Hancock County Jail with Gonzales. The inmate informed the officers that Gonzales had disclosed to her that Meyers had taken out the barrel of the gun used to kill Miller and hidden it in a storage unit. Without a specific location of the storage unit, the police began searching "every storage unit" in "the entire east side of Indianapolis" possibly being rented by Meyers. (Tr. Vol. II, p. 491). Eventually, the police located a storage unit at the Great Value Storage that had been rented by Meyers. Subsequent to a valid search of Meyers' storage unit, the police found a disassembled .380 caliber Sig Sauer gun. While the barrel of the gun was missing, forensic testing confirmed that the slide of the gun was used to fire the bullet casing found near Miller's body. There was also a

recorded phone call from the Hancock County Jail, in which Meyers instructed his wife to dispose some evidence. Detective Trent Smoll (Detective Smoll) of the Hancock Sheriff's Department also received a phone call from Meyers' brother-in-law, informing him that he was in possession of a Hornady-brand .380 caliber ammunition box that belonged to Meyers. That ammunition box was missing seven bullets.

[10] On July 30, 2014, the State filed an Information, charging Meyers with Count I, murder, I.C. § 35-42-1-1(1); and Count II, kidnapping, a Level 3 felony, I.C.§ 35-42-3-2(a). On the same day, Meyers appeared for an arraignment hearing, where he pled not guilty to the charges, and requested the trial court to appoint counsel for him. The trial court at that point appointed attorney Jeff McClarnon (Attorney McClarnon) and set the matter for a pretrial conference on September 17, 2014. On July 31, 2014, the State filed its notice of intent to file a habitual offender enhancement. On August 1, 2014, Attorney McClarnon entered his appearance. On August 15, 2014, Meyers filed a motion requesting the removal of Attorney McClarnon in order to proceed *pro se*. The trial court indicated that it would consider Meyers' motion. On August 27, 2014, following a hearing, the trial court granted Meyers' request to proceed *pro se*.

[11] On September 29, 2014, and October 1, 2014, Meyers filed motions to suppress the search warrant affidavits to search his hotel room, vehicle, and storage unit, as well as items seized in relation to those searches. Following a hearing on October 21, 2014, the trial court denied suppression with respect to the evidence

found in Meyers' storage unit. In denying Meyers' motion to suppress, the trial court indicated that it would consider Meyers' remaining requests at his trial.

[12] During a jury trial held on October 27, 2014, and November 6, 2014, Meyers again sought to suppress the probable cause affidavits for the searches relating to his hotel room, vehicle, and storage unit, but was denied. Westbrook, pursuant to a Use Immunity Agreement, testified that Gonzales had a Sig Sauer .380 caliber handgun. Westbrook also testified that Meyers confessed to shooting Miller on behalf of Gonzales after they got back to the hotel. Also, the State presented the surveillance video from the hotel, which depicted Meyers, Gonzales, Westbrook, and Miller leaving the Always Inn, and later returning without Miller. In addition, the State presented evidence of Meyers' movements through his cell phone records, thereby placing him at the scene of the crime. At the close of the evidence, the jury found Meyers guilty as charged. On December 3, 2014, Meyers was sentenced to concurrent terms in the Department of Correction of sixty years for murder and twelve years for kidnapping. Meyers' murder sentence was enhanced by an additional fifteen years for being a habitual offender, resulting in an aggregate sentence of seventy-five years.

[13] On January 2, 2015, Meyers filed a Notice of Appeal. On September 29, 2015, this court entered an order granting Meyers' motion for remand pursuant to a

*Davis/Hatton* procedure to allow him to file a petition for post-conviction relief.[1] We also ordered that following the post-conviction proceedings, Meyers could, upon the filing of a new notice of appeal, raise in a subsequent appeal any of the issues which could have been raised in the direct appeal together with any appealable issues arising from the post-conviction proceedings. On August 8, 2016, Meyers filed his petition for post-conviction relief, primarily claiming ineffective assistance of trial and appellate counsel. On September 2, 2016, the State filed its response refuting Meyers' claims, as well as a motion for summary disposition of Meyers' post-conviction petition. On August 30, 2016, the trial court summarily denied Meyers' petition for post-conviction relief, which was entered in the Chronological Case Summary (CCS) on September 6, 2016. On September 30, 2016, Meyers filed his present Notice of Appeal.

Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Admission of the Evidence*

Meyers first argues that the trial court abused its discretion by admitting the evidence obtained during the search of his hotel room, vehicle, and storage unit. We review the trial court's ruling on the admission or exclusion of evidence for an abuse of discretion. *Roche v. State*, 690 N.E.2d 1115, 1134 (Ind. 1997). We

---

[1] The *Davis/Hatton* procedure involves a termination or suspension of a direct appeal already initiated, upon appellant counsel's motion for remand or stay, to allow a post-conviction relief petition to be pursued in the trial court. *Taylor v. State*, 929 N.E.2d 912, 917 n. 1 (Ind. Ct. App. 2010), *trans. denied*.

reverse only where the decision is clearly against the logic and effect of the facts and circumstances. *Joyner v. State*, 678 N.E.2d 386, 390 (Ind. 1997). According to Meyers, his murder and kidnapping convictions should be reversed because there was no probable cause supporting the issuance of the warrants to search his hotel room, vehicle, and storage unit; and the evidence obtained from those searches was inadmissible.

## A.   *Validity of the Search Warrants*

[16]   In deciding whether to issue a search warrant, the issuing magistrate's task is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit, there is a fair probability that evidence of a crime will be found in a particular place. *Casady v. State*, 934 N.E.2d 1181, 1188-89 (Ind. Ct. App. 2010), *trans. denied*. The duty of a reviewing court is to determine whether the issuing magistrate had a substantial basis for concluding that probable cause existed. *Id.* While we review the question *de novo*, we give significant deference to the issuing magistrate's determination and focus on whether reasonable inferences drawn from the totality of the evidence support the finding of probable cause. *Id.* "In determining whether an affidavit provided probable cause for the issuance of a search warrant, doubtful cases are to be resolved in favor of upholding the warrant." *Mehring v. State*, 884 N.E.2d 371, 377 (Ind. Ct. App. 2008), *trans. denied*. "'On review, we consider only the evidence presented to the issuing magistrate and not *post hoc* justifications for the search.'" *Casady*, 934 N.E.2d at 1189 (quoting *Jaggers v. State*, 687 N.E.2d 180, 182 (Ind. 1997)). Meyers contends that the searches of his hotel room,

storage unit, and vehicle, violated both the Fourth Amendment to the U.S. Constitution and Article 1, section 11 of the Indiana Constitution.

[17]     The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The text of Article I, section 11 of the Indiana Constitution contains nearly identical language.  These constitutional principles are codified in Indiana Code § 35-33-5-2, which details the information to be contained in an affidavit for a search warrant.  *State v. Spillers*, 847 N.E.2d 949, 953 (Ind. 2006).  The statute provides in pertinent part:

> [N]o warrant for search or arrest shall be issued until there is filed with the judge an affidavit:
>
> (1) particularly describing:
>
> (A) the house or place to be searched and the things to be searched for; or
>
> (B) particularly describing the person to be arrested;
>
> (2) alleging substantially the offense in relation thereto and that the affiant believes and has good cause to believe that:

(A) the things as are to be searched for are there concealed; or

(B) the person to be arrested committed the offense; and

(3) setting forth the facts then in knowledge of the affiant or information based on hearsay, constituting the probable cause.

I.C. § 35-33-5-2(a).

### 1. *Hotel Room*

Following the announcement of Miller's body being found in a cornfield, Muse and Webster came forward with information regarding Miller's murder. On July 30, 2014, Detective Smoll prepared an affidavit for probable cause stating, in relevant part:

> On July 25th, 2014, we responded to IMPD East District Headquarters on Shadeland Avenue where two subjects came in, and reported they had information.
>
> The subjects were interviewed by Detectives and gave statements: Michelle Muse stated she stays at the Always Inn, located at 7410 East 21st Street in room 315. Muse said she knew Miller, and she used to stay at the Always Inn with different people, from time to time. Muse advised one of the residents of the Always lnn, Amanda Nell Gonzales (room 302), came over and was talking to her. Muse said her boyfriend Ike Webster, was also present. Muse believed the date was either [July 22 or July 23, 2014]. Muse said Gonzales asked her if she had ever seen a real murder take place. Muse said she told Gonzales she saw a relative die of cancer, and Gonzales said, "No somebody being killed." Muse said she told Gonzales she had not, and [did not know] what was she talking about. Gonzales told Muse that her,

Miller, Joe Meyers, and Ronnie Westbrook got into a vehicle and drove to a corn field [sic] on Carroll Road. Gonzales told Muse, they walked into the corn field [sic] and Meyers made Miller get down on her knees, and then Meyers shot her in the back of the neck. Gonzales told Muse that Meyers said to her "Lil Sis, nothing's going to happen to you." Gonzales says they got into the car and drove back to the Always Inn. Westbrook drives a white 1995, Chevy Camaro (Indiana license 227EPC, which is registered to him). Muse says she was shocked and asked why they did it. Gonzales said Westbrook got mad because some drugs came up missing out of his room, and he threatened to kill her and Miller if he didn't get them back. Muse told us Westbrook deals drugs out of his rooms. Gonzales told Muse when they got back Westbrook found the drugs in his room. Muse said she was shocked and asked why they had to kill her. Muse told us she thought Gonzales took and hid the drugs because she was mad at Miller for finding her and Westbrook in bed together. Muse says Gonzales and Westbrook have been together since February 2014. Muse asked Gonzales why she was telling her and [Gonzales] told her she was scared.

Muse told Gonzales she needed to go and tell what happened to the police. Gonzales told Muse she couldn't because she was scared that they would kill her. Muse asked if she was telling her so she would go tell someone and [Gonzales] replied "no, please don't tell anyone." Muse said Miller was her friend and it wasn't right they killed her. Muse advised us she knew it was right to tell the police what Gonzales told them.

Muse said Westbrook had a lot of guns in his room, but since Miller's body was found they have all been removed. Muse told us she has seen Gonzales carry a small silver police looking gun on her hip, and [] Westbrook carries a gun. Gonzales told Muse she heard Meyers has killed people for Westbrook in the past.

Ike Webster was interviewed on the same date by police. Webster advised us, Gonzales came into their room about four days ago. Webster said he thinks it was on July 22nd but wasn't sure. Webster advised as some of [Westbrook's] "Ice" and heroin came up missing recently. Webster says Gonzales told them about Meyers, Westbrook, Gonzales[,] and Miller got into a car and they drove out to Carroll Road. Webster advised us Gonzales said they all walked into a cornfield, and Meyers made Miller get down on her knees. Webster says Gonzales told them she started to walk away, and then Meyers shot Miller. Webster said Meyers told Gonzales they weren't going to do anything to her. Gonzales told them Westbrook ended up finding the drugs later the same day inside his room. Webster told us he has seen Gonzales carry a Glock .380 caliber with an extended clip, and Westbrook usually carries the same weapon. Webster said Gonzales is [Westbrook's] girlfriend, and he has known Meyers for 20 years. Webster told us Miller used to stay at the Always Inn, got kicked out but came back.

Detective Cook and Deputy McFarland went to the Always Inn located at 7410 East 21st Street Indianapolis, Marion County[,] Indiana and talked with the front desk worker who confirmed Westbrook and Meyers have paid for rooms in advance.

(Appellant's App. Vol. III, pp. 86-89). Meyers posits that the magistrate should not have issued the search warrant to search his hotel room because the State's request was based on unreliable hearsay information from Muse and Webster.

[19] Where, as here, a warrant is sought based on hearsay information, the affidavit must either:

(1) contain reliable information establishing the credibility of the source and of each of the declarants of the hearsay and

establishing that there is a factual basis for the information furnished; or

(2) contain information that establishes that the totality of the circumstances corroborates the hearsay.

I.C. § 35-33-5-2(b). The trustworthiness of hearsay for the purpose of proving probable cause can be established in several ways, including showing: (1) the witness has given correct information in the past, (2) independent police investigation corroborates the informant's statements, (3) the basis for the witness's knowledge is demonstrated, or (4) the informant predicts conduct or activity by the suspect that is not ordinarily easily predicted. *Smith v. State*, 982 N.E.2d 393, 405 (Ind. Ct. App. 2013), *trans. denied*. These examples are not exclusive. *Id.*

[20] Our courts have observed that there are two categories of informants: professional informants and cooperative citizens. *Clifford v. State*, 474 N.E.2d 963, 969 (Ind. 1985). The test for determining the reliability of each group of informant is different. *Id.* Cooperative citizens who act as informants

> include[ ] victims of crime or persons who personally witness a crime. These individuals generally come forward with information out of the spirit of good citizenship and the desire to assist law enforcement officials in solving crime. They are usually one-time informants and no basis exists from prior dealings to determine their reliability. Further, information of this type usually goes to past completed crimes rather than future or continuing crimes. Some jurisdictions have therefore held that informants of this type are to be considered reliable for the purpose of determining probable cause unless incriminating

circumstances exist which cast suspicion upon the informant's reliability.

*Richard v. State*, 820 N.E.2d 749, 754 (Ind. Ct. App. 2005) (quoting *Pawloski v. State*, 269 Ind. 350, 354, 380 N.E.2d 1230, 1232-33 (1978)), *trans. denied*. By the same token, "the requirement for corroboration is not totally eliminated. The amount of evidence necessary to satisfy the probable cause test is largely determined on a case-by-case basis." *Pawloski*, 269 Ind. at 355, 380 N.E.2d at 1233.

[21] We initially note that Webster and Muse fall into the category of cooperative citizens, who in the spirit of good citizenship, desired to assist law enforcement officials in solving Miller's murder. Muse indicated that she was Miller's friend, and it was the right thing for her to come forward with information regarding Miller's death. In addition, the record lacks any evidence that there were incriminating circumstances that would cast suspicion upon Muse's and Webster's reliability as informants. *See Richard*, 820 N.E.2d at 754. Further, we find that the police provided sufficient corroboration to overcome the hearsay hurdle and establish probable cause to issue the search warrant for Meyers' room. Acting on Muse's and Webster's statements, the police conducted their own independent investigations by going to the Always Inn. The hotel confirmed from their records that Westbrook and Meyers had rented rooms at the hotel—this information is not readily available in the public domain. *See Newby v. State*, 701 N.E.2d 593, 601 (Ind. Ct. App. 1998) (holding that "[t]he confirmation of 'easily obtained facts and conditions existing at the

time of the tip' is insufficient to establish an informant's credibility") (quoting *llinois v. Gates*, 462 U.S. 213, 238 (1983)). The officers also watched surveillance footage of Meyers, Westbrook, Gonzales, and Millers leaving the hotel together, and all returning to the hotel a short while later without Miller.

[22] Thus, the information gathered by the officers established a substantial basis to believe that Meyers was a suspect in Miller's murder and kidnapping, and that there was a fair probability that evidence of Miller's murder would be found in Meyers' hotel room. Considering the totality of the circumstances, we conclude that the State properly corroborated the hearsay statements of Muse and Webster, which it submitted in support of its request for a search warrant for Meyers' hotel room. Therefore, the trial court did not abuse its discretion by admitting the evidence found during the execution of the hotel room search warrant.

## 2. Vehicle

[23] The record shows that Meyers was arrested following a traffic stop while he was driving his green 2003 Ford Expedition. Following Detective Smoll's request, the magistrate issued a warrant authorizing the search of the following vehicles:

Red 2010 Honda CRV VIN: 5J6RE4H72AL065038

Blue 1999 SUZI GX7 RS VIN: JSIGR7GA1X2100077

Green 2003 Ford EPT SUV VIN: 1FMFU16L33LA23485

White 1995 Chevrolet 228 Camero VIN: 2G1FP22P4S2208193

Black 1998 Yamaha J60 Motorcycle VIN: JYA4DUE09WA069953

Red/Gry 1998 Kia Spo SUV VIN: KNDJA7236W5576288

and there diligently search for the following described property to wit: any firearms, ammunition, holsters, magazines, shell casings, clothing, trace evidence not excluding hair, blood, fibers, and DNA trace evidence, cellular phones, electronic devices, any computer towers, computer components, laptop computers, [SD] cards, [USB] devices, books, ledgers, or written documentation which would have the capacity to produce or store information about illegal activity.

(Appellant's App. Vol. III, p. 91).  Meyers claims that Detective Smoll's probable cause affidavit in support of the above search warrant lacked any information linking his green 2003 Ford Expedition vehicle to Miller's murder.

[24]    In the probable cause affidavit, Detective Smoll recapped Muse's and Webster's narration that: on the morning Miller was murdered, Meyers, Westbrook, Gonzales, and Miller all left the Always Inn *in a vehicle* and drove to a cornfield on Carroll Road.  However, Detective Smoll failed to explicitly state in the probable cause affidavit that Meyers owned the Green 2003 Ford Expedition vehicle, or allege that evidence relating to Miller's murder or kidnapping, would be recovered in that vehicle.

[25]    We have held that a probable cause affidavit must include all "material facts" known to law enforcement, which includes facts that "'cast doubt on the existence of probable cause.'"  *Ware v. State*, 859 N.E.2d 708, 718 (Ind. Ct. App.

2007), *trans. denied.* (quoting *Query v. State*, 745 N.E.2d 769, 772 (Ind. 2001)). Although it may not be practical to include all information related to an investigation in a probable cause affidavit, "the best course for police to follow is to include any information that could conceivably affect a probable cause determination." *Id*. at 719-20. When material information is omitted from a probable cause affidavit, such omission will invalidate a warrant if (1) the police omitted facts with the intent to make the affidavit misleading or with reckless disregard for whether it would be misleading, and (2) the affidavit supplemented with the omitted information would have been insufficient to support a finding of probable cause. *Id*. at 718. It has been recognized that omissions from a probable cause affidavit are made with reckless disregard "if an officer withholds a fact in his ken that '[a]ny reasonable person would have known that this was the kind of thing the judge would wish to know.'" *Gerth v. State*, 51 N.E.3d 368, 372 (Ind. Ct. App. 2016) (quoting *Wilson v. Russo*, 212 F.3d 781, 788 (3rd Cir. 2000).

[26] Any reasonable person asked to issue a search warrant in this case would have wanted to know who owned the green 2003 Ford Expedition vehicle, and why it was subject to a police search. The probable cause affidavit does not specify that Meyers owned the green 2003 Ford Expedition, neither does it provide any clear reason to conclude that a search of the vehicle would uncover evidence of criminal activity. There are legitimate questions regarding whether the issuing magistrate had enough information to determine that the search of the green 2003 Ford Expedition would uncover evidence of a crime. Regardless, it is not

necessary for us to determine whether Detective Smoll's affidavit was sufficient to establish probable cause, for even if we find that it was insufficient, the evidence obtained from the vehicle in which Meyers seeks to suppress would be admissible under the "good faith" exception to the exclusionary rule.

[27] In *United States v. Leon*, 468 U.S. 897, 920 (1984), the United States Supreme Court held that the exclusionary rule does not require the suppression of evidence obtained in reliance on a defective search warrant if the police relied on the warrant in objective good faith. *Id*. *Leon* cautioned that the good faith exception is not available in some situations, including where "(1) the magistrate is 'misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth,' or (2) the warrant was based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Id*. at 923. The good faith exception to the warrant requirement has been codified by Indiana Code section 35-37-4-5. *Id*.

[28] Meyers makes no argument that the police supplied the issuing magistrate with false information, or that the magistrate was not detached or neutral. Instead, he claims that the affidavit for probable cause was so lacking in indicia of probable cause as to render an official belief in the existence of the warrant unreasonable. We disagree. In his request seeking to search the green 2003 Ford Expedition, Detective Smoll also listed four other vehicles. Notably, Detective Smoll listed at least three suspects to Miller's murder and indicated that Meyers, Gonzales, and Westbrook, all rode *in a vehicle* to a cornfield on

Carroll Road where Meyers shot Miller. There is a reasonable inference that at least one of those vehicles could have been used on the day Miller was murdered. Therefore, we hold that, at the time the warrant was executed, it was not based upon an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. As such, the trial court did not abuse its discretion by admitting the evidence found during the execution of the vehicle's search warrant.

### 3. *Storage Unit*

[29] Meyers claims that the storage unit search warrant was solely based on hearsay information from an inmate. Following Gonzales' and Meyers' arrest, Gonzales was housed at the Hancock County Jail. While in jail, Gonzales spoke with an inmate, and she disclosed pertinent information regarding Miller's murder. In the probable cause affidavit supporting the request to search Meyers' storage unit, Detective Smoll stated:

> On July 29th, 2014[,] [the police] were contacted by an inmate at the Hancock County Jail requesting to speak with us. The inmate advised she is in the same cell block as . . .Gonzales, and [Gonzales] told her information about the murder she is charged for. The inmate says Gonzales told her . . . Meyers took the barrel out of the gun used in the murder and put it in his storage unit. The inmate told us Gonzales advised her [that]. . . Meyers said the police would not be able to trace it back to the murder without the barrel.

> On July 31st, 2014[,] Detective Doug Cook from the Hancock County Sheriff's Department went to Great Value Storage

located at 3380 N. Post Road Indianapolis, Marion County[,] Indiana. Detective Cook spoke with an employee at Great Value Storage who confirmed a Joe Meyers currently rents storage Unit B131. The employee for Great Value Storage provided Detective Cook with a copy of . . . Meyers Indiana Driver's License showing his picture, . . . and a DOB 10/04/1974. Detective Cook was able to confirm the driver's license . . . was the same Joe Meyers we are currently investigating.

(Appellant's App. Vol. II, p. 304).

[30] Our supreme court has held that independent police investigation corroborating an anonymous informant's statements will establish the trustworthiness of the hearsay for the purposes of establishing probable cause. *State v. Spillers*, 847 N.E.2d 949, 954 (Ind. 2006). However, "[t]he confirmation of 'easily obtained facts and conditions existing at the time of the tip' is insufficient to establish an informant's credibility." *Newby*, 701 N.E.2d at 601 (quoting *llinois v. Gates,* 462 U.S. 213, 238 (1983)). Indiana courts have found that confirming merely that a suspect lives in the residence and drives the vehicle identified by the informant is not adequate to establish the informant's credibility and therefore such confirmation does not support a finding of probable cause. *State v. Mason*, 829 N.E.2d 1010, 1018 (Ind. Ct. App. 2005).

[31] Here, the inmate housed with Gonzales at the Hancock County Jail recounted to the police that Gonzales had told her that Meyers had taken out the barrel of the gun used to kill Miller and hidden it in a storage unit. Information regarding what weapon had been used to kill Miller had not been publicized and that information was not readily known by a general member of the public.

*See Smith*, 982 N.E.2d at 405 (holding that hearsay information provided by jail inmate was sufficiently trustworthy to support probable cause for the issuance of search warrant for Smith's apartment, when the inmate knew details about defendant that matched robber and had not been publicized). More significantly is that the inmate did not disclose to the police the specific address of the storage unit. The record shows that the police embarked on their own independent investigation and searched "the entire east side of Indianapolis" for a storage unit rented by Meyers. (Tr. Vol. II, p. 491).

[32] Moreover, we need not decide whether the anonymous tip, standing alone, provided enough evidence to constitute probable cause because the tip was but one of many facts in the probable cause affidavit. Here, the probable cause affidavit for the storage unit repeated Muse's and Webster's account of events. Muse's and Webster's statements to the police were also part of the totality of the circumstances that may be considered sufficient to establish the reliability of the anonymous informant's statement. I.C. § 35-33-5-2(b)(2). In addition, the affidavit also contained new information from the Department of Correction showing that the GPS tracking established that Westbrook, an alleged co-actor in Miller's murder, was present in the cornfield where Miller's body had been found. Here, we conclude that the information contained in the storage unit probable cause affidavit, as a whole, corroborated the inmate's statement and provided sufficient evidence to support the magistrate's probable cause determination. Accordingly, the trial court did not abuse its discretion by admitting the disassembled gun obtained from Meyers' storage unit.

## II. *Sufficiency of the Evidence*

[33] Meyers claims that the evidence is insufficient to sustain his convictions for murder, a felony, and kidnapping, a Level 3 felony. When reviewing the sufficiency of the evidence needed to support a criminal conviction, we neither reweigh evidence nor judge witness credibility. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009). "We consider only the evidence supporting the judgment and any reasonable inferences that can be drawn from such evidence." *Id*. We will affirm if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt. *Id*.

[34] Indiana Code section 35-42-1-1(1) provides that "[a] person who: (1) knowingly or intentionally kills another human being . . . commits murder, a felony." Meyers claims that the evidence presented at trial was insufficient to establish that he knowingly or intentionally killed Miller. "A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." I.C. § 35-41-2-2(b). "A person engages in conduct 'intentionally' if, when [s]he engages in the conduct, it is [her] conscious objective to do so." I.C. § 35-41-2-2(a). Intent and knowledge may be proved by circumstantial evidence and inferred from the circumstances and facts of each case. *Heavrin v. State*, 675 N.E.2d 1075, 1079 (Ind.1996), *reh'g denied*. Also, one is presumed to have intended the reasonable results of his or her own acts. *Id*.

[35] At Meyers' jury trial, Westbrook testified that Meyers confessed to him that he shot Miller. In addition, there was ample circumstantial evidence linking Meyers to Miller's murder. Near Miller's body, the officers recovered a Hornady .380 shell casing. Fragments from a bullet of the same or similar caliber were found in Miller's skull, and during the search of Meyers' hotel room, the police recovered six unfired Hornady .380 bullets in the nightstand. Meyers brother-in-law contacted Detective Smoll and stated that he was in possession of a Hornady-brand .380 caliber ammunition box that belonged to Meyers—that box was missing seven bullets. Further, a disassembled gun that was used to kill Miller was found in Meyers' storage unit. In addition, the State presented evidence of Meyers calling his wife from jail and instructing her to dispose some evidence. Additionally, the State presented the surveillance video from Always Inn showing Westbrook, Gonzales, Meyers, and Miller, all leaving in one vehicle on the morning Miller was murdered. Meyers' presence at the scene where Miller was killed was corroborated by his cell phone records. Here, we find that there was sufficient evidence to support Meyers' murder conviction.

[36] Meyers also claims that his Level 3 felony kidnapping conviction is unsupported by the evidence. Indiana Code Section 35-42-3-2(a) provides: "A person who knowingly or intentionally removes another person, by fraud, enticement, force, or threat of force, from one place to another commits kidnapping." The offense is a Level 3 felony if it is committed while armed with a deadly weapon. Ind. Code § 35-42-3-2(b)(2)(A). Meyers first asserts that

there was no evidence that Miller was kidnapped through fraud, enticement, force, or threat of force. We disagree. Westbrook testified that Miller accepted a ride from Meyers believing that Meyers would drop her off at 30th and German Church Road. Instead of dropping off Miller at her designated stop, Meyers drove Miller to a cornfield off Carroll Road where he eventually killed her.

[37] Meyers' next challenge is to the lack of evidence showing that he had a firearm at the time Miller was kidnapped. At his jury trial, the State argued that Meyers was guilty as an accomplice to Gonzales in Miller's kidnapping. The jury was instructed regarding accomplice liability.

[38] For the purpose of accomplice liability, our courts consider the following factors when determining whether a defendant aided another in the commission of a crime: "(1) presence at the scene of the crime; (2) companionship with another at scene of the crime; (3) failure to oppose commission of crime; and (4) course of conduct before, during and after occurrence of crime." *Vitek v. State*, 750 N.E.2d 346, 352 (Ind. 2001). While the defendant's presence during the commission of the crime or his failure to oppose the crime are, by themselves, insufficient to establish accomplice liability, the jury may consider them along with other facts and circumstances tending to show participation. *Garland v. State*, 719 N.E.2d 1236, 1237 (Ind. 1999). In order to sustain a conviction as an accomplice, there must be evidence of the defendant's affirmative conduct, either in the form of acts or words, from which an inference of common design

or purpose to effect the commission of a crime may be reasonably drawn. *Peterson v. State*, 699 N.E.2d 701, 706 (Ind. Ct. App. 1998).

[39] Westbrook's testimony established that Meyers and Gonzales were working together as part of a plan to kill Miller. Specifically, Westbrook testified that when he saw that Meyers had failed to stop at 30th Street and German Church Road, where Miller had been requested to be dropped off, Westbrook saw Meyers and Gonzales look at each other suspiciously, and that is when he knew "something wasn't right." (Tr. Vol. V, p. 1036). After Meyers shot Miller, he reassured Gonzales by stating, "Lil Sis, nothing's going to happen to you." (Appellant's App. Vol. III, p. 86). Westbrook additionally testified that Meyers and Gonzales routinely carried guns, and the evidence also supported a reasonable inference that either Meyers or Gonzales had a gun at the time Miller was murdered. Moreover, forensic testing confirmed that the slide of the disassembled .380 caliber Sig Sauer gun recovered from Meyers' storage unit, was used to fire the bullet casing found near Miller's body. Based on the foregoing, we conclude that the State presented sufficient evidence to sustain Meyers' Level 3 felony kidnapping conviction.

## IV. *Judicial Bias*

[40] We next turn to Meyers claim that the trial court was biased against him. "The law presumes that a judge is unbiased and unprejudiced." *Smith v. State*, 770 N.E.2d 818, 823 (Ind. 2002). "Such bias and prejudice exists only where there is an undisputed claim or where the judge expressed an opinion of the

controversy over which the judge was presiding." *Id.* Adverse rulings are not sufficient of themselves to establish bias or prejudice. *Resnover v. State*, 507 N.E.2d 1382, 1391 (Ind. 1987) (citing *Thomas v. State*, 486 N.E.2d 531 (Ind. 1985)). Here, Meyers filed a motion to suppress the search warrant affidavits to search his hotel room, vehicle, and storage unit; as well as items seized in relation to those searches. After a hearing on October 21, 2014, the trial court denied Meyers' request to suppress the evidence found in Meyers' storage unit, and reserved Meyers remaining challenges to be addressed at his jury trial. Meyers postulates that the judge must have been biased from the start since he had partly denied his motion to suppress at the pretrial stage. However, mere assertions of adverse rulings by a judge do not establish the requisite showing of bias. Further record demonstrates that the trial judge did not express an opinion on the merits of the case. Meyers' claim that the judge was biased therefore fails.

## V. *Ineffective Assistance of Counsel*

[41]     Meyers used the *Davis/Hatton* procedure as outlined in Appellate Rule 37 to stay his direct appeal and pursue a petition for post-conviction relief in the trial court. We initially note that Meyers summarized four claims in his PCR petition as: (1) newly discovered evidence; (2) ineffective assistance of trial counsel; (3) ineffective assistance of appellate counsel; and (4) a claim of judicial bias. However, in his PCR petition, Meyers only addressed claims relating to ineffective assistance of counsel. With his trial counsel, who represented him between August 1-27, 2014, Meyers claimed that his counsel

was ineffective for failing to object to Meyers being unrepresented by counsel at the "arraignment hearing, nor did he investigate the content of the arraignment hearing." (Appellant's App. Vol. III, p. 143). In addition, Meyers claims that his trial counsel was ineffective for failing to detect an issue of judicial bias and which would have necessitated the filing of a motion for change of judge.[2]

[42] In a post-conviction proceeding, the petitioner must establish the grounds for relief by a preponderance of the evidence. Ind. Post-Conviction Rule 1(5); *Overstreet v. State*, 877 N.E.2d 144, 151 (Ind. 2007). When challenging the denial of post-conviction relief, the petitioner appeals from a negative judgment. *Overstreet*, 877 N.E.2d at 151. To prevail, the petitioner must show that the evidence leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court. *Id*. We will disturb the post-conviction court's decision only where the evidence is without conflict and leads to but one conclusion and the post-conviction court reached the opposite conclusion. *Henley v. State*, 881 N.E.2d 639, 643-44 (Ind. 2008).

[43] Where the post-conviction court enters findings of fact and conclusions of law, as in the instant case, we do not defer to the post-conviction court's legal conclusions; the post-conviction court's findings and judgment will be reversed,

---

[2] Meyers also claimed that his appellate counsel was ineffective for failing to raise an issue on his direct appeal—*i.e.*, whether the trial court erred when it denied Meyers' motion to suppress. As discussed, Meyers filed a *Davis/Hatton* petition and we dismissed his direct appeal. Accordingly, any possible deficiency in his appellate counsel's performance became moot when he was granted remand to pursue post-conviction relief.

however, only upon a showing of clear error that leaves us with a definite and firm conviction that a mistake has been made. *Overstreet*, 877 N.E.2d at 151.

[44] There is a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Monegan v. State*, 721 N.E.2d 243, 250 (Ind. 1999). To make a successful ineffective assistance claim, a petitioner must establish both deficient performance and resulting prejudice according to the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). *Ben–Yisrayl v. State*, 729 N.E.2d 102, 106 (Ind. 2000). First, the petitioner must prove that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. *Id.*; *See Thompson v. State*, 671 N.E.2d 1165, 1168 (Ind. 1996). We presume counsel's performance was not deficient absent convincing evidence to the contrary. *Winters v. State*, 698 N.E.2d 1197, 1198 (Ind. Ct. App. 1998), *trans. denied*. The petitioner must secondly prove that counsel's substandard performance was so prejudicial that he was deprived of a fair trial. *Thompson*, 671 N.E.2d at 1168. In determining whether the defendant was prejudiced, we look to the totality of the evidence and ask whether there is a reasonable probability that the outcome would have been different but for counsel's errors. *Wine v. State*, 637 N.E.2d 1369, 1378 (Ind. Ct. App. 1994), *trans. denied*. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *Id.* The concept of prejudice has been further defined as whether counsel's deficient performance rendered the trial

result unreliable or the proceeding fundamentally unfair. *Rondon v. State*, 711 N.E.2d 506, 517 (Ind. 1999).

[45] The record shows that when Meyers was presented in court and read his charges on July 30, 2014, he did not have counsel, but the trial court appointed Attorney McClarnon to represent him. We therefore find his claim that Attorney McClarnon was ineffective for failing to object to him being unrepresented by counsel at the arraignment hearing to be baseless. Also, Meyers' judicial bias claim, *i.e.*, that Attorney McClarnon should have sought change of judge because an adverse ruling on his motion to suppress was indicative of the judge being biased, also lacks merit. Attorney McClarnon represented Meyers for a limited period—from August 1, 2014, to August 27, 2014. That period of representation included the deadline to file a motion for a change of judge. *See* Ind. Crim. Rule 12(D) ("An application for a change of judge or change of venue from the county shall be filed within thirty (30) days of the initial hearing."). However, to the extent that Meyers places the bulk of his ineffective assistance of counsel claim on the fact that Attorney McClarnon should have sought a change of judge primarily due to a partly-adverse ruling on his motion to suppress, we recognize that the ruling was issued on October 21, 2014. At that time, Meyers was representing himself. Here, Meyers fails to direct us to any other deficient performance rendered by Attorney McClarnon at the initial stages of his case that resulted in prejudice.

## VI. *Summary Disposition of Meyers' PCR Petition*

[46] Lastly, Meyers contends that post-conviction court failed to provide specific findings of fact and conclusions of law in the summary disposition of his post-conviction relief.

[47] After Meyers filed his PCR petition, the State filed a motion for summary disposition pursuant Indiana Post-Conviction Rules 1(4) (f) and (g), claiming that Meyers is not entitled to relief because:

> [Meyers] misled or lied to this Court in his Petition when he stated that he was represented at trial by counsel, Jeff McClarnon.  [Meyers] made a request to proceed *pro se* at trial shortly after his arrest on the murder case and this request was granted by the Court.  [Meyers] did, in fact, represent himself at trial.  [Meyers] did ask for Mr. McClarnon to represent him for the Habitual Offender Sentencing Enhancement phase of the trial, however [Meyers] does not make any claims of ineffectiveness of Mr. McClarnon for that phase of the trial.
>
> ****
>
> 5.  Further, [Meyers'] claim of ineffective assistance of appellate counsel is moot because [Meyers] moved to dismiss his direct appeal to pursue this Petition for Post-Conviction Relief.  His request was granted by the Indiana Court of Appeals and his direct appeal was dismissed without prejudice.  Because he has not pursued a direct appeal, he cannot argue that appellate counsel was ineffective.
>
> 6.  That from all the pleadings that have been filed in this case, there are no genuine issues of a material fact or facts.

7. The State of Indiana is entitled to judgment as a matter of law.

8. Oral arguments are not necessary in this case.

(Appellant's App. Vol. III, pp. 190-91). An entry on the CCS dated September 6, 2016, shows the post-conviction court summarily denying Meyers' post-conviction relief and issuing the following finding:

> COURT REVIEWS [MEYERS'] MOTION TO SET EVIDENTIARY HEARING. COURT NOW HAVING REVIEWED THE RECORD IN THIS CAUSE NOW FINDS [MEYERS] WAS SELF REPRESENTED BY HIS CHOICE AT TRIAL, THEREFORE INEFFECTIVE ASSISTANCE OF COUNSEL IS NOT AVAILABLE TO HIM. COURT FURTHER FINDS THAT [MEYERS] WAS ASSISTED BY COUNSEL FOR THE HABITUAL OFFENDER PHASE OF THIS CASE, BUT ADMITTED THE HABITUAL OFFENDER PHASE STATUS DURING THAT STAGE OF THE HEARING. BEING WITH THESE FACTS IN MIND THE COURT DENIES MOTION FOR EVIDENTIARY HEARING AND DENIES MOTION FOR POST-CONVICTION RELIEF.

(Appellant's App. Vol. III, p. 192).

[48] We note that the State's motion of summary disposition was filed pursuant to Indiana Post-Conviction Rules 1(4)(f) and (g). Disposal of a PCR petition under each of these two subsections lead to a different standard of review. When a court disposes of a petition under subsection f, we essentially review the lower court's decision as we would a motion for judgment on the pleadings. The court errs in disposing of a petition in this manner unless "the pleadings

conclusively show that petitioner is entitled to no relief." P.-C.R. 1 § 4(f). If the petition alleges only errors of law, then the court may determine without a hearing whether the petitioner is entitled to relief on those questions. *Clayton v. State*, 673 N.E.2d 783, 785 (Ind. Ct. App. 1996). However, if the facts pled raise an issue of possible merit, then the petition should not be disposed of under section 4(f). *Id*. at 786. "This is true even though the petitioner has only a remote chance of establishing his claim." *Id*. at 785.

[49] On the other hand, when a court disposes of a petition under subsection g, we review the lower court's decision as we would a motion for summary judgment. *Hough v. State*, 690 N.E.2d 267, 269 (Ind. 1997), *reh'g denied*, *cert. denied*, 525 U.S. 1021 (1998). We face the same issues that were before the post-conviction court and follow the same process. *Poling v. State*, 740 N.E.2d 872, 877-878 (Ind. Ct. App. 2000)*, disapproved on other grounds by Graves v. State,* 823 N.E.2d 1193, 1195 n. 1 (Ind. 2005). A grant of summary disposition is erroneous unless "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id*. at 878; *See* P-C.R. 1 § 4(g). We must resolve all doubts about facts, and the inferences to be drawn from the facts, in the non-movant's favor. *Poling,*740 N.E.2d. at 878. The appellant has the burden of persuading us that the post-conviction court erred. *Id*.

[50] The differences in the manner in which we review decisions made under the two subsections lead us to conclude that these two subsections of the post-conviction rule were intended to create two independent means by which a court could summarily dispose of a post-conviction petition. *Allen*, 791 N.E.2d

at 753.  Consequently, to determine the appropriate standard of review for the court's disposal of Meyers' petition, we must determine whether the court disposed of Meyers' petition under subsection f or subsection g of Post–Conviction Rule 1, section 4.  Under the plain language of subsection g, a court may grant summary disposition after "a motion by either party" and after considering the pleadings and other evidence submitted. P.-C.R. 1 § 4(g).  Here, the State filed a motion of summary disposition, therefore the PCR court's decision must have been made pursuant to subsection 4(g).

[51]  Meyers maintains that the post-conviction court erred for not issuing specific findings of fact and conclusions of law on *all four* issues raised in his PCR petition.  It is true that Indiana Post-Conviction Rule 1(6) requires a PCR court to "make specific findings of fact, and conclusions of law on all issues presented, whether or not a hearing is held."  This would seem to require PCR courts to enter findings and conclusions, even if it grants a motion for summary disposition.  *But see State v. Daniels*, 680 N.E.2d 829, 831-32 (Ind. 1997) (comparing Indiana Post-Conviction Rule 1(4)(g) with Indiana Trial Rule 56 and stating, "[s]pecific findings and conclusions are neither required nor prohibited in the summary judgment context").  However, a PCR court's failure to enter specific findings of fact and conclusions of law in ruling on a PCR petition is not reversible error when the issues are sufficiently presented for review and addressed by the parties. *Jackson v. State*, 676 N.E.2d 745, 750 (Ind. Ct. App. 1997), *trans. denied*.  If the facts underlying a claim are not in dispute, the issues are sufficiently clear, and both parties address the merits in their

briefs, remand for specific findings by the PCR court is not necessary. *Id.* (citing *Lowe v. State*, 455 N.E.2d 1126, 1128 (Ind. 1983)). The underlying facts here are not in dispute, the issue is sufficiently clear, and both parties address the merits in their briefs. Consequently, we will address the issue rather than remanding to the post-conviction court.

[52] Meyers raised four issues, but only fully addressed the issues pertaining to ineffective assistance of trial and appellate counsel. As we have already explained, Meyers' trial counsel did not render ineffective assistance, and Meyers cannot have possibly have a received ineffective assistance of appellate counsel since he abandoned his direct appeal to pursue post-conviction relief. Here, there were no genuine questions of fact with respect to Meyers' PCR petition and the State was entitled to judgment as a matter of law. Accordingly, the trial court correctly granted the State's motion for summary disposition.

## CONCLUSION

[53] Based on the above, we conclude that (1) the search warrants for Meyers' hotel room, vehicle, and storage unit were valid, and the trial court properly admitted evidence pursuant to those searches; (2) there was sufficient evidence to support Meyers' convictions for murder and Level 3 felony kidnapping; (3) Meyers failed to establish bias or prejudice on the part of the trial judge; (4) Meyers failed to establish that he suffered ineffective assistance of trial counsel; and (5) the trial court correctly granted the State's motion for summary disposition.

[54] Affirmed.

Robb, J. and Pyle, J. concur